**ANTONIC RIGGING AND ERECTING OF MISSOURI, INC., Plaintiff,**

v.

**FOUNDRY EAST LIMITED PARTNERSHIP; AMT Foundry, Inc., Individually and as the General Partner of Foundry East Limited Partnership; and Mayflower Group, Ltd., Individually and as a Partner of Foundry East Limited Partnership, Defendants.**

**No. CV 190–173.**

United States District Court, S.D. Georgia, Augusta Division.

Aug. 6, 1991.

---

Larry S. McReynolds, Michael Welch, Atlanta, Ga., A. Rowland Dye, Augusta, Ga., for plaintiff.

John I. Harper, N. Staten Bitting, Jr., Fulcher, Hagler, Reed, Obenshain, Hanks & Harper, Augusta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

This case arises out of a breach of contract dispute between a Missouri contractor and a Georgia limited partnership. Before the Court are cross-motions for summary judgment submitted by the plaintiff, Antonic Rigging and Erecting of Missouri, Inc. ("Antonic Rigging"), and defendants, Foundry East Limited Partnership ("Foundry East") and the Mayflower Group, Ltd. ("Mayflower Group"). The defendants' motion advances several grounds for summary judgment. First, the defendants argue that a subscription agreement between the partners did not create an enforceable promise to contribute to the limited partnership. Second, the defendants argue that a limited partner may not be held liable as a general partner for the debts of a limited partnership merely by participating in the management or control of the business. The plaintiff's motion for partial summary judgment addresses the same issues and requests that the Court grant summary judgment in its favor as to the defendants' liability for contributions to the limited partnership and for the debts of the partnership.

As a preliminary matter, the plaintiff claims that this Court should disregard the

defendants' response to its motion for summary judgment because it was filed more than 20 days after the plaintiff's motion. Local Rule 6.6 of the Southern District of Georgia provides:

Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in addition to the brief, there shall be annexed to the motion a separate, short and concise statement of the material facts as to which it is contended there exists no genuine issue to be tried as well as any conclusions of law thereof. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. Response to a motion for summary judgment shall be made within (20) days of service of the motion.

The defendants filed a motion for summary judgment on April 8, 1991. The plaintiff filed a cross-motion for partial summary judgment on April 8, 1991. The defendants did not respond to the plaintiff's motion until May 9, 1991, more than 20 days after the plaintiff's motion. Despite this failure to comply with Local Rule 6.6, the Court will consider the defendants' May 9, 1991 pleading, which the defendants characterize as a "Supplemental Brief". The Court's consideration of the arguments in the defendants' May 9, 1991 brief, however, will be limited to those arguments that supplement its original brief in support of summary judgment and not those that respond to the plaintiff's motion. This limited consideration will not prejudice the plaintiff because the defendants raised the issue of limited partner liability and submitted affidavits and other documentary evidence with their initial motion. The Court cautions the defendants that all other pleadings filed in this Court must be filed on time.

## BACKGROUND

### A. *The Partnership Agreement and the Subscription Agreement*

NAPPCO, Inc. ("NAPPCO"), Mayflower Group, Ltd. ("Mayflower Group"), and Mayflower Foundry ("Mayflower Foundry") entered into a limited partnership agreement to form Foundry East Limited Partnership ("Foundry East") in July of 1989. The purpose of the limited partnership was to develop a steel fitting and pipe foundry in Warrenton, Georgia. NAPPCO acted both as general partner and as a limited partner, and Mayflower Group and Mayflower Foundry (collectively, "Mayflower") served as limited partners.

As a condition for obtaining industrial revenue bonds from Warren County for the foundry project, the partnership was required to raise two million dollars. Schedule A to the "Contract of Limited Partnership of Foundry East Limited Partnership" sets forth the partnership's capitalization requirements: NAPPCO received two general partnership units in return for $20,0000 consideration, and 98 Class B partnership units in return for $980,000 consideration. Mayflower Foundry received 80 Class A partnership units in return for $800,000 consideration. Mayflower Group received 20 Class A partnership units for $200,000 consideration.

The partners also signed a separate subscription agreement that detailed the financial arrangements among the partners with respect to capital contributions to the project. The meaning of this subscription agreement is in dispute. The plaintiff contends that the subscription agreement obligated Mayflower to contribute five million dollars to the partnership. The defendants claim that the agreement required Mayflower to contribute only one million dollars to the partnership and also required Mayflower to loan NAPPCO one million dollars to meet its capitalization obligations in accordance with Schedule A of the certificate. The defendants adamantly deny the plaintiff's contention that they were obligated to contribute another three million dollars to the partnership.

### B. *Contract Negotiations*

In order to build and fit the foundry, the limited partnership negotiated with Antonic

Rigging. Antonic Rigging had previously participated with NAPPCO in foundry building ventures in the Far East. Antonic Rigging and NAPPCO began discussing the Warrenton project in January 1989, prior to the formation of Foundry East. At this time, NAPPCO informed Antonic Rigging that they planned to create a partnership for the foundry project with the Mayflower Group, a Boston investment firm that owned the foundry property. NAPPCO told Antonic Rigging that NAPPCO would be the general partner. NAPPCO asked Antonic Rigging to perform the initial design feasibility and cost data work. NAPPCO also asked Antonic Rigging to perform an environmental impact study. Antonic Rigging performed the work and continued meeting with NAPPCO principals in April, May, and June 1989, as plans for the foundry project crystallized. Ultimately, as a result of negotiations between Jeffrey Antonic, William Chase, and Charles Roach, another NAPPCO officer, the limited partnership entered into three contracts with Antonic Rigging. The three agreements, a preliminary design-build agreement (the "design contract"), a standard form design-build agreement (the "construction contract"), and an equipment contract, were signed by Jeffrey Antonic, the principal officer of Antonic Rigging, and William J. Chase, NAPPCO's treasurer.[1]

As explained below, Antonic Rigging has not been paid for all of the work done pursuant to these contracts. Antonic Rigging contends that Mayflower is liable for these debts because Mayflower participated in and controlled the contract negotiations, and because Mayflower assumed the role of a general partner. Mayflower vigorously denies any involvement in the contract negotiations between NAPPCO and Antonic Rigging.

Although Antonic Rigging was aware of Mayflower's interest in the foundry project, throughout the time Antonic Rigging worked on the environmental impact study and prepared the contracts, Antonic Rigging dealt only with NAPPCO. Antonic Rigging was aware that Mayflower was to be a limited partner, and not the general partner of Foundry East. Jeffrey Antonic admitted that he was shown the limited partnership documents by Chase before he signed the contracts. Nonetheless, Jeffrey Antonic claims that his decision to enter into the contracts with Foundry East was based, in large measure, on representations that Mayflower was committed to contributing several million dollars to the partnership. According to Jeffrey Antonic, NAPPCO told Antonic Rigging that "Mayflower would continue to be rather active in the partnership rather than just selling them the land and walking away, that Mayflower was reinvesting some money and it committed, I believe three or four million dollars worth of their capital to put back into the new partnership...."[2]

Mayflower supports its denial of liability by pointing to its lack of involvement in the contract negotiations between NAAPCO and Antonic Rigging. Between January 1989, the time that NAPPCO and Antonic Rigging began to discuss the foundry project and November 6, 1989, neither Jeffrey Antonic nor anyone else associated with Antonic Rigging had any substantive contact with Mayflower. In his deposition testimony, Jeffrey Antonic stated that he was merely introduced to Marshall Stearman, another Mayflower officer, by telephone on one occasion. Jeffrey Antonic also claimed that he believed that Mayflower was actively involved in the contract process because Chase was frequently on the telephone with Mayflower while Jef-

---

**1.** Jeffrey Antonic signed the contracts on June 28, 1989 and William Chase signed the contracts on August 17, 1989. The full name of the limited partnership—Foundry East Limited Partnership—does not appear anywhere in the contracts. At the time Antonic Rigging drafted the contracts, Foundry East had not been officially formed. Jeffrey Antonic, however, claims that at all times during the contract negotiation period he was led to believe that he was negotiating with the general partner of the limited partnership and would be contracting with Foundry East. By August 17, 1989, the date Chase signed the contracts as "General Partner," Foundry East was an official limited partnership.

**2.** *Deposition of Jeffrey Antonic,* at 42 (Oct. 25, 1990).

frey Antonic was present. Although Jeffrey Antonic claims that Mayflower controlled the negotiations, no one from Mayflower had any direct or personal involvement in the contracts. In fact, Paul Chrestensen, a vice president of Mayflower, claimed that he had no knowledge of the contracts with Antonic until June, 1990. He knew only that Chase had conducted discussions with Antonic Rigging and that Antonic Rigging had performed the environmental impact study.[3]

Indeed, Jeffrey Antonic first met Mayflower principals in November of 1989, several months after the contracts were executed. According to Jeffrey Antonic, the November encounter was an all-day meeting addressing NAPPCO's problems obtaining the $3,000,000.000 necessary to finance the equipment contract. Chrestensen characterized the encounter as a primarily social lunch where the participants discussed blueprints and conceptual designs for the foundry.[4] Jeffrey Antonic testified that Stearman said that Mayflower "felt the money would be in place by the 3rd January, 1990 and that everyone was working very hard on getting it underway."[5] At the same time, Chase told him that "Mayflower had an option ... due at the end of December '89 and if they didn't get the option that he would try and get the 3 million from other sources."[6]

#### C. *NAPPCO's Financial Problems*

After the November meeting, NAPPCO began experiencing severe financial difficulties. On or about May 24, 1990, NAPPCO resigned as general partner. At the same time, Chase and Chrestensen agreed to form a corporation called AMT Foundry, Inc. ("AMT") to substitute as general partner. The amended and restated certificate of limited partnership was filed with the Georgia Secretary of State on May 29, 1990. The Mayflower entities owned 50% of AMT's stock and Francis Chase (William Chase's son) owned the other 50%. AMT did not assume the obligations of the prior general partner. Almost immediately after AMT was formed, Mayflower asked Frank Chase and William Chase to resign from their positions as officers and directors of AMT. After their resignation, Mayflower Foundry owned 80% of the shares issued and Mayflower Group owned the other 20% of the shares issued. Some of Mayflower's officers and directors became the officers and directors of AMT.

During this period, Antonic Rigging continued to do some development and engineering work pursuant to the preliminary design contract. The record is unclear as to when Antonic Rigging ceased all performance under the contracts, but Antonic Rigging had slowed down its work by May, 1990. In June, 1990, Antonic Rigging approached Mayflower to discuss the status of the foundry project and to request compensation. Antonic Rigging met with Mayflower again in July 1990 to discuss whether Antonic Rigging would continue to work on the project and Antonic Rigging's payment demands. Ultimately, Antonic Rigging was replaced with another contractor.

#### D. *Default*

Antonic Rigging billed Foundry East $320,310.00 under the design contract. To date, Foundry East has paid Antonic Rigging $186,500.00 of this fee. Antonic Rigging also invoiced Foundry East $68,000.00 for furnaces it purchased in accordance with the equipment contract. None of this money has been paid. Mayflower now contends that the equipment contract is unenforceable. The equipment contract contained a paragraph entitled "Payment Terms." There is a slash mark over the paragraph and beside the slash mark the handwritten words, "As per separate agreement," appear. The defendants claim that they never reached or entered into a separate agreement with Antonic Rigging and, consequently, that there is no binding

---

**3.** *Deposition of Paul Chrestensen,* at 82 (Jan. 17, 1991).

**4.** *Id.* at 80–81.

**5.** *Deposition of Jeffrey Antonic,* at 56.

**6.** *Id.* at 58.

contract. Antonic Rigging claims that the parties negotiated a cash flow payment arrangement with Chase in August, 1989, that was intended to serve as the separate agreement. Antonic Rigging asserts that this payment arrangement was modified at the request of Chase in November or December, 1989.

Antonic filed a complaint in this Court on August 10, 1990. In addition to damages under the design contract and the charges incurred under the equipment contract, Antonic Rigging seeks a termination fee under the construction contract, late charges, cancellation charges under the equipment contract, penalties for bad faith litigation, and attorney's fees.

## ANALYSIS

### I. SUMMARY JUDGMENT

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56 advisory committee note). The Court "must determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir. 1991); *Regan v. United States Small Business Admin.*, 926 F.2d 1078, 1080 (11th Cir.1991) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The substantive law governing the action determines whether an element is essential. *E.g., Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1813,

108 L.Ed.2d 943 (1990). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990). The movant typically must discharge this burden by producing evidence that negates an essential element of the nonmovant's claim. *E.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

If the movant successfully discharges this initial burden, it is then the nonmovant's burden to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). "Factual disputes that are irrelevant or unnecessary will not be counted." *United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir.1991) (citation omitted). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2514; *Gilbert*, 920 F.2d at 882. This means that the nonmovant "must set forth specific facts showing that there is a genuine need for trial." *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991) (citation omitted).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Regan*, 926 F.2d at 1080; *Gilbert*, 920 F.2d at 882. A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). "Where the record, taken as a whole could not lead a

rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Johns v. Jarrard,* 927 F.2d 551, 556 (11th Cir.1991). The Court must avoid weighing conflicting evidence, *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Brown v. Hughes,* 894 F.2d 1533, 1536 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir.1986), or making credibility determinations. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). At bottom, "where the facts specifically averred by [the nonmovant] contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. National Wildlife Federation,* — U.S. —, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990).

## II. THE SUBSCRIPTION AGREEMENT: CONTRIBUTION ISSUES

Antonic Rigging asserts that Mayflower has an outstanding contribution obligation to Foundry East for $3,645,000.00 under the subscription agreement. In advancing this claim, Antonic Rigging hopes to establish Mayflower's liability so that it may proceed directly against Mayflower to collect the amount of the allegedly unpaid contribution if it receives a judgment in its favor on the breach of contract claims. This claim presents three related issues for the Court to resolve.

### A. *Paragraph 2: The Initial Contribution*

■ The parties engage in battle over whether the evidence submitted in support of the defendants' motion for summary judgment demonstrates that Mayflower contributed $645.000.00 to the limited partnership as part of the initial $2,000,000.00 contribution required by Paragraph 2 of the subscription agreement. Paragraph 2 of the agreement states:

2. Mayflower will pay $1,000,000.00 to the Partnership on behalf of and for the benefit of NAPPCO in addition to the $1,000,000.00 for which it has subscribed. NAPPCO will repay Mayflower $750,-000.00 on or before July 31, 1989 and the remaining $250,000.00 on or before September 30, 1989.

Mayflower contributed $355,000.00 to Foundry East, in addition to the $1,000,-000.00 capital contribution listed in Schedule A. Mayflower claims that this contribution fulfilled its obligation to make a $1,000,000.00 on behalf of NAPPCO because NAPPCO itself contributed $645,-000.00 to the partnership. Mayflower vigorously asserts that this $645,000.00 was in fact paid to the partnership, relieving it of any obligation under paragraph 2 of the agreement. Antonic Rigging disputes Mayflower's evidence of payment, submitting documentary evidence that raises a question of fact about whether the remaining $645,000.00 was ever paid to Foundry East's account.

Mayflower urges the Court to decide this issue on summary judgment based on affidavits submitted as evidence of payment. After reviewing the facts in the light most favorable to Antonic Rigging, the nonmovant on this issue, however, the Court finds that Antonic Rigging has demonstrated that there are genuine issues of material fact in dispute regarding the payment. Therefore, the Court will not resolve this issue on summary judgment. Nor will the Court address the related evidentiary issues raised by the parties concerning proof of payment of the $645,000,000. At trial, the trier of fact must determine whether the $645,000.00 was ever paid to Foundry East. The trier of fact must also determine whether this contribution obligation was reduced or eliminated by the consent of Foundry East's partners, as explained in part II–C, below.

### B. *Paragraph 3: The Additional Contribution*

■ The second issue the Court must decide is whether the subscription agreement creates a binding obligation on the part of Mayflower to contribute or arrange

for a loan of an additional $3,000,000 to Foundry East, or whether the subscription agreement is merely an unenforceable understanding between the members of the limited partnership to attempt to obtain this funding. Paragraph 3 of the subscription agreement addresses the possibility of a $3,000,000.00 contribution to the limited partnership:

> 3. Mayflower agrees to contribute or arrange for the contribution of an additional $3,000,000.00 to the Partnership on or before December 31, 1989 ... Notwithstanding the foregoing, NAPPCO agrees that Mayflower's obligation to contribute or arrange for the contribution of an additional $3,000,000.00 to the Partnership shall be deemed to be satisfied if Mayflower loans or arranges for a loan to the Partnership of $3,000,000.00, provided (a) that the terms and conditions of such loan are acceptable to NAPPCO and (b) that the Contract is amended in such manner as determined by NAPPCO to be necessary to reduce Partnership distributions to Mayflower to the extent determined by NAPPCO, provided, however, that Mayflower shall retain sufficient units or class of units which are entitled to at least 20% of all distributions from the Partnership.

This paragraph must be read in conjunction with the following paragraph of the subscription agreement. *See Sparks v. Sparks*, 193 Ga. 368, 370, 18 S.E.2d 556 (1942) ("in the construction of contracts every provision is to be considered, and, if possible given effect"); *Pounds v. Hospital Auth. of Gwinnett County*, 191 Ga. App. 689, 693, 382 S.E.2d 602 (1989). Paragraph 4 provides,

> If Mayflower fails to satisfy its obligations pursuant to paragraph 3 of this Agreement ... NAPPCO agrees to arrange for a contribution or loan to the Partnership in such amount and on such terms as NAPPCO determines. If NAPPCO arranges a contribution or loan of at least $3,000,000.00, then, unless the parties agree otherwise, the Contract shall be amended in such manner as determined by NAPPCO to be necessary to reduce Partnership distributions to May-

flower to the extent determined by NAPPCO, provided, however, that Mayflower shall retain sufficient units or class of units which are entitled to at least 20% of all distributions form the Partnership. If NAPPCO arranges a loan of less than $3,000,000.00, then the 20% limitation of the previous sentence shall be increased by 1% for each $100,000 (or .001% for each $1.00) that the loan is less than $3,000,000.00 ... Except for any reduction in Partnership distributions as provided in this Subscription Agreement, no party shall be liable for any damages for failing to meet their obligations set forth herein.

Where the meaning of a contract is clear and unambiguous on its face, the Court may not look beyond the contract to find the intention of the parties. *See Hunsinger v. Lockheed Corp.*, 192 Ga.App. 781, 783, 386 S.E.2d 537 (1989). "No construction of a contract is required or permitted when the language used by the parties is plain unambiguous and capable of only one reasonable interpretation." *Id.* The clear and unambiguous meaning of the arrangement created by paragraphs 3 and 4 is that the sole remedy for failure of either party to contribute or obtain a loan is the restructuring of limited partnership units or distribution rights. Although Antonic Rigging disputes this interpretation, it concedes that the subscription agreement states that the parties will not be liable to each other if they fail to contribute or procure a $3,000,000.00 loan. Therefore, the subscription agreement does not create an enforceable promise that Mayflower will contribute $3,000,000.00 to Foundry East.

### C. *The Georgia Revised Uniform Limited Partnership Law*

■ Antonic Rigging argues that even if the limited partners are not liable to each other, the subscription agreement cannot bar creditors from pursuing the contributors to the subscription agreement. Antonic Rigging's position is not the law in Georgia. Georgia law allows the members of a limited partnership to prevent a creditor from recovering a limited partner's unpaid contribution obligations if all the partners

agree to reduce or eliminate that contribution obligation. Even if there had been an obligation, which the Court has already decided there was not, the partners could still eliminate, by agreement, that enforceable obligation. The subscription agreement reveals that the partners of Foundry East, in effect, have agreed to limit creditor recovery. Moreover, the partnership law may bar Antonic Rigging from recovering the $645,000.00 under paragraph 2 of the subscription agreement. Even if the jury finds that this contribution was never paid to Foundry East, the jury might also find that Foundry East's partners agreed to reduce or eliminate Mayflower's contribution obligation.

The law governing a limited partner's liability for capital contributions is found in O.C.G.A. § 14–9–502 (1989). Section 14–9–502 provides, in relevant part:

(b) Except as provided in the partnership agreement:

(1) A partner is obligated to the limited partnership to perform an otherwise enforceable promise to contribute cash or property or to perform services and to pay interest on the agreed contribution from the date the contribution is due.

(2) This obligation exists even if the partner is unable to perform because of death, disability, or any other reason.

(c) Unless otherwise provided in the partnership agreement, the obligation of a partner to make a contribution to the capital of the partnership may be reduced or eliminated only by consent of all parties.

The history of section 14–9–502(c) reveals that this section was intended to apply to creditors who allegedly relied on the contribution obligation.[7] That section 14–9–502 was intended to bar creditor recovery from limited partners is supported by a comparison with the prior law, codified as O.C.G.A. § 14–9A–48. This earlier code provision provides that a limited partner is liable to the partnership for any unpaid contribution, and that any waiver or compromise of that obligation "shall not affect the right of a creditor of a partnership, who extended credit or whose claim arose after the filing and before a cancellation or amendment of the certificate, to enforce such liabilities." O.C.G.A. § 14–9A–48(c). Antonic Rigging mistakenly cites this provision in support of its assertion that, "Creditors such as Antonic may pursue limited partners who fail to pay their subscription agreement to a limited partnership." This section only applies to those limited partnerships existing before July 1, 1988, that did not elect to adopt the provisions of the Revised Uniform Limited Partnership Act. *See* O.C.G.A. § 14–9–1201 (1989). Foundry East was created in July 1989, one year after the effective date of the new law. Therefore, section 14–9–502 governs this case.

The Georgia law also differs from the contribution provision of the official Revised Uniform Limited Partnership Act ("RULPA"), drafted in 1976 (and amended in 1985) by the National Conference of

7. The Court has been unable to locate any Georgia or Eleventh Circuit case law construing the 1988 version of the Georgia Revised Uniform Limited Partnership Act. *See* O.C.G.A. § 14–9–100 *et seq.* (1989). Although the State of Georgia does not record the legislative history of its laws, the Court has uncovered some evidence of the intent of the drafters and sponsors of the Georgia Revised Uniform Partnership Law. In April 1988, before the legislation was adopted, James L. Smith, III, then co-chairman of the Joint Committee on Partnership Law of the Corporate & Banking Section and Real Property Law Section of the State Bar of Georgia, prepared an outline of the general provisions of the proposed law [hereinafter, "Joint Committee Outline"] that was circulated to members of the legislature. Mr. Smith has provided a copy of that outline to aid the Court in interpreting the Georgia statute.

In addition, the Court's law clerk spoke with Professor Larry Ribstein of the Georgia Mason University School of Law by telephone on July 17, 1991. Professor Ribstein was extremely helpful to the Court. Professor Ribstein was the Reporter to the Joint Committee and prepared the comments to the Georgia Revised Uniform Partnership Law, which appear in the Official Code of Georgia. Although the comments do not have the force of statutory law and were not intended to be evidence of legislative intent, read in conjunction with the Joint Committee Outline, they provide some guidance to the Court.

Commissioners on Uniform State Laws. RULPA has been adopted in many jurisdictions. *See* RULPA § 502, 6 U.L.A. 355–57 (West Supp.1991) (listing jurisdictions adopting the official RULPA provision). Section 502 of the official RULPA provides that even where all the members of a limited partnership agree to compromise a limited partner's obligation, "a creditor of a limited partnership who extends credit, or otherwise acts in reliance on that obligation after the partner signs a writing which reflects the obligation, and before the amendment or cancellation thereof to reflect the compromise, may enforce the original obligation." (West Supp.1991). The Georgia law does not include any similar provision. Therefore, a comparison of the language of the official RULPA with the current Georgia statute strengthens the argument that the Georgia legislature intended to limit creditor recovery.

Therefore, Antonic Rigging's argument that the partners could not bar creditors from recovering unpaid contribution obligations is not in accord with current Georgia law. Even if there had been an enforceable promise to contribute $3,000,-000.00, Foundry East's partners could have agreed subsequently to reduce or eliminate that contribution obligation. Such a reduction or elimination would have been effective against all creditors. The Court sees no reason to distinguish that situation from the situation where the members of the limited partnership agree, in advance, to eliminate any liability for failure to obtain additional capital for a limited partnership. This advance consent is precisely what the partners achieved through the subscription agreement. Georgia law clearly allows the members of the limited partnership to reduce or eliminate liability for any unpaid contribution obligation.

Moreover, section 502(c) of the Georgia Revised Uniform Limited Partnership Act applies to the $645,000.00 allegedly owed by Mayflower under paragraph 2 of the subscription agreement. There is some evidence in the record that all of Foundry East's partners agreed to reduce the $1,000,000.00 contribution "on behalf of and for the benefit of NAPPCO" by $645,-000.00. Section 502 may operate to cancel any liability on the part of Mayflower if the facts and evidence produced at trial show that NAPPCO and Mayflower agreed to reduce Mayflower's loan obligation. The Court will defer this issue to trial because there is not enough evidence in the record to conclude, as a matter of law, that Foundry East's partners agreed to reduce this obligation.

## III. MAYFLOWER'S LIABILITY AS A GENERAL PARTNER

■ Antonic Rigging claims that Mayflower should be held responsible as a general partner for the obligations of Foundry East because it participated in the management and control of Foundry East's business. The provisions of the Georgia Revised Uniform Limited Partnership Act defeat Antonic Rigging's argument. O.C.G.A. § 14–9–303 clearly states:

A limited partner is not liable for the obligations of a limited partnership by reason of being a limited partner and does not become so by participating in the management or control of the business.

O.C.G.A. § 14–9–303 (1989). Thus, even if the record unequivocally established that Mayflower participated in the management or control of Foundry East, Mayflower would not be liable under current Georgia law. The Georgia statute differs in significant respects from prior Georgia law and the official RULPA. *See* O.C.G.A. § 14–9A–41 (1989); RULPA § 303, 6 U.L.A. 325 (West Supp.1991). Section 14–9A–41, which applies to Georgia partnerships existing before July 1, 1988, provides that: "A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business." Section 303 of the official RULPA, is entitled, "Liability to Third Parties," and provides, in part:

(a) [A] limited partner is not liable for the obligations of a limited partnership unless he is also a general partner or, in addition to the exercise of his rights and powers as a limited partner, he partici-

pates in the control of the business. However, if the limited partner participates in the control of the business, he is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner.

The official RULPA also contains a nonexclusive list of "safe harbor" activities that will not give rise to liability. RULPA § 303(b), 6 U.L.A. 325 (West Supp.1991). Thus, under both prior Georgia law and the official RULPA, a limited partner may be held liable as a general partner for participating in the control of a limited partnership's business. The current Georgia statute explicitly rejects the control rule found in these enactments:

> Under most modern limited partnership statutes, the "control" rule has been diminished to the point where there is no liability for participation in control without creditor reliance, and an extensive "safe harbor" is usually provided. Even so, uncertainty as to the degree of control which can trigger liability creates significant disincentive to limited partnership investments, and accordingly *the proposed new law eliminates the control test.*

Joint Committee Outline § 303 (1988) (emphasis added). Georgia's abandonment of the control rule is consistent with the criticisms by many commentators. *See, e.g.,* Basile, Limited Liability for Limited Partners: An Argument for the Abolition of the Control Rule, 38 VAND.L.REV. 1199 (1985) (criticizing uncertainty created by control rule for potential limited partners and their counsel).

Notwithstanding the plain language of the Georgia statute, there are conceivably some situations in which a limited partner in a Georgia limited partnership may become liable as a general partner. The Joint Committee Outline states that: "Third parties are protected if ... they are misled by a limited partner's participation in control into believing that such individual is a general partner by their ability to impose liability upon such limited partner through es-

toppel, fraud or general equitable grounds under a 'veil piercing' theory." Joint Committee Outline § 303 (1988). The Court will now turn to these exceptions.

### A. *Estoppel*

▇ Estoppel in the partnership context is governed by O.C.G.A. § 14–8–16 (1989). Section 14–8–16(a) provides:

> (a) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership ... he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

Although this section is intended to apply to regular Georgia partnerships, the overall principles of partnership by estoppel translate easily into the limited partner context. Simply put, a limited partner may become a general partner by operation of estoppel if that limited partner holds himself out as a general partner or consents to another person's representation that he is a general partner and a creditor relies on those representations. *Cf. Pope v. Triangle Chemical Co.,* 157 Ga.App. 386, 277 S.E.2d 758 (1981). Creditor reliance is unnecessary if the limited partner makes or consents to a public representation that he is a general partner.

▇ The record does not support a finding of general partnership by estoppel because there is no evidence of reliance. Mayflower never represented nor consented to any representations that it was a general partner of Foundry East. Although NAPPCO made certain representations about the amount of money Mayflower planned to contribute to the partnership, at all times Antonic Rigging was aware

that NAPPCO would serve as general partner and Mayflower would serve as a limited partner of Foundry East. Although Jeffrey Antonic claims that he relied on NAPPCO's representations that Mayflower would invest five million dollars in Foundry East, that reliance does not justify finding Mayflower a general partner by estoppel. Even if Jeffrey Antonic wrongly concluded that the subscription agreement created a binding obligation on Mayflower to arrange for or contribute $3,000,000.00 to Foundry East, as early as November, 1989, Chase informed Antonic that NAPPCO and Mayflower merely had the option to arrange the financing.

Moreover, Antonic Rigging's only evidence of public representations of Mayflower's activities as a general partner (which would eliminate the need for creditor reliance) are too late to save the day for Antonic Rigging. At a meeting of the Warrenton City Council on July 10, 1990, Chrestensen, a Mayflower principal, stated:

> [T]he Mayflower group, in a firm resolve to get the project operational, has come in and taken over control of the project by having Napco [sic] relinquish its general partnership provision. The Mayflower Group has formed a new company called AMT Foundry Corporation ... Because of the way the ownership was structured, we've had to have Napco [sic] resign as the general partner, assume the general partnership responsibilities ...

*Excerpt of Meeting of the City Council, City of Warrenton, Georgia,* at 4 (July 10, 1990). Although these statements provide some evidence that, as of May, 1991, Mayflower, through AMT, assumed some of the duties of a general partner, they do not give rise to general partnership by estoppel. First, in his remarks, Chrestensen refers to AMT and explains that he is not giving the full details of the organizational structure because "the particulars of that and how it would all be structured, I think, are left for more detailed meetings and not an open forum like this." *Id.* Second, the contracts that were the subject of this suit were all signed by August 6, 1989, almost

one year before Mr. Chrestensen's remarks. Chrestensen's remarks were made after Antonic Rigging had almost ceased performance and after Antonic Rigging had met with Mayflower to discuss the status of the project in June and July, 1990. These remarks, made one month before Antonic Rigging commenced this lawsuit, do not provide evidence that Mayflower became a general partner by estoppel.

### B. *Veil Piercing and Fraud*

■ Antonic concedes that AMT cannot be held liable as a general partner because it was an after-admitted general partner that did not explicitly assume the existing debts of Foundry East. Nonetheless, Antonic argues that Mayflower operated as a general partner through AMT's corporate form. The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has "overextended its privileges in the use of a corporate entity in order to defeat justice, to perpetrate fraud, or evade statutory, contractual, or tort responsibility." *Hickman v. Hyzer,* 261 Ga. 38, 39, 401 S.E.2d 738 (1991); *Commonwealth Financial Corp. v. Sherrill,* 197 Ga.App. 403, 404, 398 S.E.2d 438 (1990).

AMT was wholly-owned and controlled by Mayflower. Although this status may give rise to an inference that Mayflower abused the corporate entity, there is no evidence that Mayflower planned to perpetuate fraud. Mayflower and William Chase formed AMT to rescue the foundry project from NAPPCO's serious financial problems. Even under prior Georgia law, a limited partner did not become liable as a general partner for participating in the management of a business when "a project is confronted with a severe financial crisis." *Trans–Am Builders, Inc. v. Woods Mill, Ltd.,* 133 Ga.App. 411, 210 S.E.2d 866 (1974). Because of Chase's financial problems, however, Mayflower requested that Chase and his son resign from AMT. Mayflower thus became the sole shareholder of AMT.

There is also no evidence that Mayflower formed AMT to avoid legal liability to Antonic Rigging. Although Chrestensen was

aware that Antonic Rigging had performed some initial consulting work on the foundry project, he testified, in his deposition, that he was not aware of the three contracts until June, 1990, one month after AMT was formed. Moreover, it is conceivable that Mayflower could not have had constructive knowledge of the construction contract or the equipment contract because Antonic Rigging had not commenced performance under those contracts (except for procuring $68,000 of furnaces under the twelve million dollar equipment contract). Therefore, it would be inappropriate to pierce the corporate veil and hold Mayflower liable as a general partner.

## IV. THE EQUIPMENT CONTRACT

Mayflower contends that Antonic Rigging cannot recover under the equipment contract because it lacks a definite payment term and therefore no binding contract was ever made. Antonic Rigging argues that the parties negotiated a separate agreement containing payment terms for the equipment based on anticipated cash flow from the initial stages of the foundry project. The defendants are correct in their assertion that a contract that does not contain a definite payment term is void. *See City of Decatur v. Georgia Presbyterian Homes, Inc.*, 251 Ga. 290, 304 S.E.2d 908 (1983). Antonic Rigging, however, has presented sufficient evidence to preclude the Court from determining, as matter of law, that the contract lacked a definite payment term.[8]

Next to the payment term provision in the original equipment contract are the handwritten words, "As per separate agreement". Antonic Rigging claims that the August 11, 1989 letter and attached cash flow projections for the equipment contract constitute that separate agree-

ment. The August 11, 1989 letter explicitly refers to the equipment contract: "With reference to the second flow chart, this refers to the Equipment Contract for a total of $12,145,888. These figures are based on shipments and/or billings for shipment in two-week increments, and ninety-five percent of the cost of each piece of machinery shall be paid prior to actual delivery on site...." The letter further provides that "all initial payments for hardware are anticipated on the 31st of October, 1989, for a total of $400,000,000 in initial deposits." The cash flow requirements chart specific payments on specific dates for each item of equipment. In addition to these cash flow charts, there is another set of "Projected cash flow requirements for additions as of 12–26–89." In his affidavit, Jeffrey Antonic claims that the second set of cash flow projections were modified payment terms specifically requested by Chase.

The defendants claim that the cash flow payment charts do not amount to a separate agreement. They assert that even if the cash flow payments could be construed as the separate agreement alluded to in the equipment contract, the cash flow payment charts are by the statute of frauds because they are not signed by the party to be charged. The Court rejects this argument:

> The statute of frauds does not require that all the terms of the contract should be agreed to or written down at one and the same time, nor on one piece of paper; but where the memorandum or the bargain is found on separate pieces of paper, and where these papers contain the whole bargain, they form together such a memorandum as will satisfy the statute, provided the contents of the signed paper make such references to the other written paper or papers as to enable the

---

8. The defendants state that the Court should disregard Jeffrey Antonic's affidavit on this issue because it conflicts with his deposition testimony. After reviewing the deposition testimony and the affidavit, the Court disagrees. "An affidavit may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions that negate the existence of any genuine issue of material fact ... [and that party] attempts thereafter to negate such answers with an affidavit that merely contradicts, without explaining previously given clear testimony.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986) (citing, *Van T. Junkins and Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir.1986). Construing the deposition testimony and affidavit in favor of Jeffrey Antonic, a lay witness and the nonmovant on this issue, the Court will resolve all doubts in favor of Antonic and consider his affidavit.

court to construe the whole of them together as containing all the terms of the bargain.

*Industrial Welding & Tool Supplies, Inc. v. CIT Corp.*, 157 Ga.App. 611, 611, 278 S.E.2d 50 (1981) (citations omitted). The original equipment contract was signed and explicitly referred to a separate agreement. The Court finds that the evidence of separate memoranda, containing payment schedules, presented by Antonic Rigging is sufficient to withstand motion for summary judgment. The trier of fact must decide whether or not the cash flow projections constitute a definite payment term.

Antonic Rigging, however, may have difficulty introducing the projections, dated December 26, 1989, at trial because the document containing the projections does not specifically refer to the original signed equipment contract and the two documents "cannot be correlated and connected together by parol evidence." *Id.* at 612, 278 S.E.2d 50. The Court will not decide whether the document is admissible at this stage, however, but will defer this decision until trial.

## CONCLUSION

At the outset of this case, it appeared that there were millions of dollars at issue. Because of the Court's resolution of the parties' cross-motions for summary judgment, only $645,000.00 remains in dispute. To summarize, the Court DENIES the defendants summary judgment on the issue of whether Mayflower fulfilled its obligation to contribute $1,000,000.00 on behalf of NAPPCO. At trial, the trier of fact must determine whether the disputed $645,000.00 was ever paid to Foundry East, and whether the partners agreed to eliminate or reduce Mayflower's loan obligation from $1,000,000.00 to $355,000.00.

The Court GRANTS the defendants summary judgment as to the absence of any liability for the $3,000,000.00 of funding discussed in paragraphs 3 and 4 of the subscription agreement because that agreement did not give rise to an enforceable contribution obligation. Moreover, the Georgia Revised Uniform Limited Partnership Law bars creditors from recovering unpaid contribution obligations from limited partners, where, as here, the limited partners effectively agreed to eliminate that obligation.

The Court also GRANTS the defendants summary judgment on the issue of liability, as a general partner, based on the defendant's participation in the control or management of the business. The Georgia Revised Uniform Limited Partnership Law expressly allows limited partners to participate in the control or management of a business without incurring liability as general partners. None of the equitable exceptions apply to Mayflower's conduct in this case. Because the Court rules in favor of the defendants on these issues, the Court DENIES the plaintiff's motion for summary judgment on the liability issues.

In addition, the Court DENIES the defendants' summary judgment motion to declare the equipment contract fatally defective for the lack of a definite payment term. The plaintiff has produced sufficient evidence of a separate agreement, pursuant to the original equipment contract, to withstand summary judgment on this issue.

SO ORDERED.