755 A.2d 608 (2000)
333 N.J. Super. 258
Shelley ZEIGER, Plaintiff-Appellant/ Cross-Respondent,
v.
Joseph WILF, Defendant-Respondent, and
Capitol Plaza Assoc., Trenton and Goldberger, Moore & Novick Trenton No. 2, Inc., Defendants/Cross-Appellants, and
Goldberger, Moore & Novick, Urban Renewal, L.P., as successor to 240 West, L.P., and Goldberger, Moore & Novick, Trenton, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 2000.
Decided July 19, 2000.
*609 R. James Kravitz argued the cause Lawrenceville, for appellant, cross-respondent Shelley Zeiger (Fox Rothschild, O'Brien & Frankel, attorneys; Mr. Kravitz, on the brief).
Sheppard A. Guryan argued the cause, Roseland, for respondent Joseph Wilf and cross-appellants Capitol Plaza Assoc., Trenton and Goldberger, Moore & Novick Trenton No. 2, Inc. (Lasser Hochman, attorneys; Mr. Guryan, of counsel; Bruce H. Snyder, on the brief).
Before Judges MUIR, Jr., CUFF and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
This case offers a virtual primer in the Byzantine relationships among various forms of business organizations employed in a modern venture capital project. It includes a limited partnership, a corporation, a general partnership and several sophisticated individuals all involved in the proposed redevelopment of a hotel/office building in downtown Trenton. It also demonstrates the significance of limited individual liability which is a key reason for employing some of those entities, and the inevitable risk that anticipated rewards from such a venture may not be realized.
At issue here is an agreement by which plaintiff, a seller of the property to be renovated, was to receive a "consultant fee" of $23,000 per year for sixteen years. The payments, however, ceased after two years. A jury found the redevelopers (a limited partnership and a corporation) liable for those payments, and an appeal by those entities has now been abandoned. As a result, the matter now focuses on plaintiff's claim that Joseph Wilf, the individual who led the various defendant entities, should be held personally liable for the consultant payments and that such liability should also be imposed on a general partnership owned by Wilf and members of his family.
There is no claim that Wilf personally, or his general partnership, ever guaranteed the consultant payments or that plaintiff ever believed Wilf had made such guarantees. Nor is there a claim that plaintiff did not understand at all times that he was contracting only with a limited partnership and/or a corporation, and not with Wilf personally or with his general partnership. For those reasons, and also because we find no merit in various other theories of individual liability advanced by plaintiff, we affirm the summary judgment entered in favor of Wilf individually, and we reverse the judgment against Wilf's family-owned general partnership.
The property in question was a rundown hotel on West State Street in Trenton, *610 located near several State government buildings. In or shortly before 1981, plaintiff Shelley Zeiger and his associate, Darius Kapadia, purchased the property with the intention of renovating and operating the hotel. They undertook some renovation and began operations but could not obtain sufficient financing to complete the project.
In or around March 1985, Steven Novick, an experienced developer, approached plaintiff concerning a possible purchase of the property. Novick believed the building could be successfully renovated and operated as an office building, (with perhaps some hotel facilities included), particularly if he could lease some or all of the office space to the State. Richard Goldberger, another experienced developer, soon joined Novick in the project, as did another associate, said to have considerable contacts within the State government. Plaintiff was also well known in Trenton governmental and political circles.
As the negotiations proceeded, Novick brought defendant Joseph Wilf into the picture. Wilf was described as a "deep pocket partner," whose financial means could help insure the success of the project. He was also a well known and successful real estate developer and soon became the leader and primary spokesman for the purchasing group. Novick and Goldberger generally deferred to Wilf during the negotiations and structuring of the transaction.
On February 17, 1986, the negotiations culminated in a contract with a purchase price of $3,840,000 for the real estate, a liquor license, and miscellaneous assets connected with the hotel's operation. The contract was signed by a corporation formed by the purchasers, known as Goldberger, Moore & Novick, Trenton, No. 2, Inc., (hereinafter, "Trenton, Inc." or "the corporation").
As the deal was finally struck, the parties also agreed that plaintiff would receive a "consulting fee" of $27,000 per year, payable monthly for sixteen years. While plaintiff was to provide assistance when requested, it is clear that he was not expected to devote much time or effort to the project. The agreement specified he would not be required to spend more than two days per month in consultations. Plaintiff claims the consultation payments were, in reality, an additional part of the payment price, structured as they were to provide tax benefits to the Novick/Goldberger/Wilf group. In addition, plaintiff was to receive from the project two and one half percent of "annual net cash flow after debt service."
Closing took place on March 4, 1986. Trenton, Inc., was the purchaser and also signed the consultant agreement with plaintiff. The contract documents authorized the corporation to assign its property interests, as well as the consulting contract, to another entity, and on the day following closing the corporation did that by assignment to a limited partnership named Goldberger, Moore & Novick, Trenton, L.P., (hereinafter "Trenton L.P." or "the limited partnership").
The limited partnership then began the anticipated renovation and operation of the hotel/office building. Trenton, L.P. consisted of one general partnerthe corporation just referred to (Trenton, Inc.), which owned 4.9 percent of the limited partnership. In addition, it had four limited partners: an entity known as Midnov, owned by Novick and Goldberger, which held a 42.7 percent interest; another entity known as Capitol Plaza Associations (CPA), controlled by Wilf and his family and described further below, which also owned 42.7 percent; George Albanese, a former State official, who held a 5.1 percent interest; and plaintiff Shelley Zeiger who owned a 4.9 percent interest.
The stock of Trenton, Inc., was owned fifty percent by Midnov (Novick and Goldberger's entity) and fifty percent by CPA (the Wilf family entity). Goldberger became president of Trenton, Inc.; Wilf was vice president; Novick was secretary/treasurer, *611 and Bernadette Lynch was assistant secretary.
Thus, all of Wilf's interests in both the limited partnership and the corporation were held through his family entity, CPA. CPA was a general partnership and defendant Joseph Wilf was one of the general partners. While other family members were also general partners in CPA, Joseph Wilf was clearly its guiding and dominating force.
Shortly after closing, Trenton, L.P. began its attempts to secure both state leases for the property and a 9.5 million dollar mortgage to finance the required renovation. Wilf was the leader in that operation as he was in all aspects of the project. He maintains that in doing so, he was functioning as vice president of the corporation, which was the only general partner of the limited partnership. In substance, he claims that the limited partnership was operating (as it was required to do) through its general partner. Since that general partner was a corporation, the corporation was, in turn, operating in the only way that a corporation can operate: by the actions of its officers and agents. He maintains further that Goldberger and Novick soon abdicated most responsibility and simply stopped functioning as corporate officers___a claim not disputed by plaintiff. Thus, Wilf says, it was left to him to function as the responsible corporate officer.
Both the limited partnership and the corporation operated informally.[1] There were few, if any, corporate meetings, resolutions or minutes. Wilf was less than meticulous in affixing his corporate title to documents or other papers which he says he signed as an officer of the corporate general partner. Significantly, however, plaintiff makes no claim that at any time he thought Wilf was operating in some other capacity, or that he believed Wilf or CPA were undertaking any personal responsibility or liability for any part of the project.
The limited partnership began making the monthly consultation payments to plaintiff in early 1986, and it continued to do so for approximately two years. In March 1988, however, the payments were stopped at Wilf's direction. An additional $12,000 was paid in May 1989 (which represented almost all the amount then due to plaintiff), but thereafter no further payments were made. Wilf said at the time that the money was needed for the renovation project and that (alone among all the participants), plaintiff was contributing nothing to the project. Plaintiff complained to Novick, and Novick promised to discuss the matter with Wilf. Novick did so, but Wilf continued to maintain that plaintiff should receive no further payments and thus, no further payments were made. Wilf subsequently acknowledged that he was not familiar with the terms of the consultation agreement or plaintiff's rights thereunder.
Trenton, L.P., did obtain its desired 9.5 million dollar renovation loan. However, by January 1987, those funds were exhausted and more money was needed. Wilf maintains that he invested an additional $565,000 in the project through his own company, and he then obtained a 2.8 million dollar mortgage loan from First Chicago Bank, which he, his brother and Goldberger personally guaranteed. Wilf subsequently paid off that mortgage butpresumably to repay his $565,000 investment and his payoff of the First Chicago loanhe took a $3,063,000 mortgage from Trenton, L.P., covering the office building/hotel.[2]
*612 Eventually, the project failed. The limited partnership and the corporation filed bankruptcy, as did Novick individually. On July 19, 1993, plaintiff sued Wilf, claiming that Wilf had become the "surviving partner and owner of the partnership assets" pertaining to the "purchase and transfer of" the hotel, and that he was in default respecting payment of plaintiff's consulting fees.
On July 30, 1993, shortly after plaintiff filed his complaint, the New Jersey Secretary of State revoked the corporate charter of Trenton, Inc. The record does not reveal the circumstances of or the reasons for the revocation. It indicates only that records in the Secretary of State's office showed the corporation as "void by proclamation," with a suspension date of July 30, 1993. However, on March 13, 1997, the Secretary of State issued a new certification, stating that the charter had been "voided in error for non-payment of State taxes by Proclamation on July 30, 1993," but that the corporation "was reinstated on March 13, 1997." There was no further indication of the "error" involved, nor, again, did the record indicate the circumstances of or reason for the initial revocation or the subsequent reinstatement.
On March 28, 1995, plaintiff filed an amended complaint naming as defendants Joseph Wilf; CPA; Trenton, L.P.; and Trenton, Inc. Approximately eighteen months later, after extensive discovery, Wilf moved for summary judgment dismissing the complaint as to him, which the motion judge granted on December 23, 1996. On January 24, 1997, that judge denied a motion for reconsideration.
On March 3, 1997, trial against the other defendants began before a different judge. While that trial was proceeding, the Secretary of State issued the aforesaid reinstatement certificate. On April 8, 1997, a jury returned a $456,801 verdict against the limited partnership and the corporation, to which sum the trial court added pre-judgment interest. However, while the trial court had submitted to the jury the liability issue as to the limited partnership and the corporation, it had withheld for determination by the court plaintiff's claim against CPA. On December 4, 1997, the court found that CPA was also liable to plaintiff for the aforesaid $456,801, and entered judgment against it for that amount.
This appeal was initially filed by plaintiff, seeking reversal of the judgment in favor of Joseph Wilf. A cross-appeal was then filed by CPA, by Trenton, L.P. and by Trenton, Inc. As noted however, because of the intervening bankruptcy proceedings, defendants have advised that no "useful purpose is served by continuing to process this appeal" on behalf of the limited partnership or the corporation. Thus, defendants have argued for reversal only as against CPA while, of course, also maintaining that the dismissal as to defendant Wilf should be affirmed.

I
In his argument on summary judgment respecting Wilf, and also in his claim at trial against CPA, plaintiff claimed that the suspension of Trenton, Inc.'s charter provided a basis for imposing liability against Wilf and CPA. The motion judge rejected the argument as to Wilf; the trial judge accepted it as to CPA. We are satisfied that the motion judge was correct, and the trial judge was incorrect. The charter suspension provides no basis for imposing liability on either Wilf or CPA.

A
In his pretrial motion, plaintiff argued that once Trenton, Inc.'s charter was suspended, Wilf could no longer act as an officer of the corporation and thus he was acting in his individual capacity when he *613 directed the activities of Trenton, L.P. There are a number of difficulties with that theory.
First, the breach of plaintiff's consulting contract occurred in 1989, when Trenton, L.P. made its last payment to him and made clear that it would make no further payment. At that time, the corporate charter was fully in effect. The proclamation of revocation occurred only some four years lateron July 30, 1993. Thus, assuming the revocation had the effect claimed by plaintiff, that effect occurred only long after plaintiff's contract had been breached and his cause of action had accrued.
Second, even assuming the critical actions occurred while the charter was suspended, the charter has since been reinstated. By statute as well as case law, that reinstatement was effective retroactively, as of the date the charter was initially revoked, and all corporate actions taken "in the interim" were validated back to the date of original suspension.
N.J.S.A. 14A:4-5(7), provides:
If the certificate of incorporation of a domestic corporation ... has been revoked by proclamation, the certificate shall be reinstated by proclamation of the Secretary of State upon: (a) payment by the corporation of all fees due... and (b) certification of the Director of the Division of Taxation that no cause exists for revocation of the corporation's certificate of incorporation.... The reinstatement relates back to the date of issuance of the proclamation revoking the certification of incorporation or the certificate of authority and shall validate all actions taken in the interim. (Emphasis added.)
In Asbestos Workers Local Union No. 32 v. Shaughnessy, 306 N.J.Super. 1, 703 A.2d 276 (App.Div.1997), this court dealt with that provision and resolved a claim indistinguishable in principle from plaintiff's claim here. There, corporate officers had signed a contract on behalf of the corporation while its charter was suspended for failure to file an annual report and pay required fees. The trial court determined that the individuals had thus become "liable for the debts arising under the contracts they signed on behalf of the corporation." This court reversed for two reasons. First, it saw
no reason for such a rule where the contracting party neither relied upon the individual assurances of the officers nor upon their credit. The rule determined by the trial judge could cause havoc in the business community. Corporate charters are suspended for a variety of reasons such as failure to file the annual report as in this case, ... failure to pay corporate franchise taxes, ... [or] the failure to follow a variety of statutes or administrative regulations. Under the trial judge's ruling, every corporate officer would be required to consult the corporation's attorneys and accountants, or perhaps the Secretary of State before any agreement were signed, at the risk of becoming personally liable for the corporate obligation.
Second, this court quoted the statutory provision set out above, concluding that:
The Act could not be clearer. [Absent some element of fraud or express reliance] [t]he reinstatement validated the agreement between the Union and the Corporation. The statute governing the revocation of the charter for non-filing of annual reports contains its own reinstatement provisions including those for relation back and validation of actions taken during the revocation period. There is thus no reason to add personal liability to that of the corporation.

[Id. at 5, 703 A.2d 276.]
That reasoning applies here. Even ignoring the actual time sequence, and assuming that some significant actions took place during the suspension period, N.J.S.A. 14A:4-5(7) and the decision in Asbestos Workers make clear that once the charter was reinstated, that reinstatement *614 related back to the "date of issuance of the proclamation revoking the certificate," and all actions "taken in the interim" were validated. As this court noted in Asbestos Workers, "[t]he act could not be clearer," and there is "no reason to add personal liability to that of the corporation."[3]

B
After completion of the trial against Trenton, L.P., Trenton, Inc., and CPA, plaintiff moved for reconsideration of the pre-trial summary judgment which had dismissed his claim against Wilf. Plaintiff claimed the evidence presented at trial had substantiated his original claim against Wilf and thus, based on that evidence, his complaint against Wilf should be retroactively reinstated. The trial judge initially reserved decision on the motion but ultimately denied it.
Plaintiff's argument for reconsideration of the summary judgment granted to Wilf is without merit.
One of the purposes of summary judgment is to afford protection
[A]gainst groundless claims and frivolous defenses, not only to save antagonists the expense of protracted litigation but also to reserve judicial manpower and facilities to cases which meritoriously command attention.
[Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540-41, 666 A.2d 146 (1995) (quoting from Robbins v. Jersey City, 23 N.J. 229, 240-41, 128 A.2d 673 (1957)).]
Consistent with that purpose, once a party successfully dismisses a complaint against him by winning summary judgment, he need not participate in a subsequent trial against other defendants. While reversal on appeal is of course possible, the trial proceeding is otherwise successfully completed for one such as Wilf, who obtained summary judgment.
The concept of employing trial evidence produced against certain defendants to undo a pretrial summary judgment dismissing the complaint as to a different defendant would undercut much of the benefit of the summary judgment practice. It would mean that a defendant who procured dismissal of the complaint against him might nevertheless be required to appear, perhaps participate in, and certainly stay aware of what was happening in the trial from which the summary judgment should have liberated him. Indeed, if evidence produced at that trial could be used against him, he might well be required to seek participation in the trial, to cross-examine witnesses, and perhaps even present witnesses of his own in order to avoid having the victory he obtained set aside retroactively. Plaintiff submits no authority to sustain that extraordinary proposition, and we know of none, neither in precedent nor in policy.
In short, there was no basis to reconsider or set aside the pretrial summary judgment granted to Wilf, dismissing plaintiff's complaint against him.

C
Although the trial court correctly refused to set aside the summary judgment which had been granted to Wilf, it then granted what could be considered essentially equivalent relief by holding CPA liable for Wilf's actions in guiding the operations of Trenton, L.P. Whereas the motion judge had correctly concluded that Wilf's actions were taken as an officer of *615 Trenton, Inc. (functioning as the general partner of Trenton, L.P.), the trial judge inexplicably found that Wilf's actions were taken as a general partner of CPA. On that premise, the court concluded that CPA (via Wilf's actions) had operated as a general partner of Trenton, L.P. and had thus become liable for the limited partnership's actions, including the $456,801 liability which the jury assessed against Trenton, L.P. and Trenton, Inc. However, we see no basis to conclude that Wilf was at any time functioning on behalf of CPA, nor do we perceive any other basis for liability against CPA.
The trial court's reasoning rested almost entirely on the suspension of Trenton, Inc.'s corporate charter. The court concluded that during that suspension, Wilf could not have been acting as a corporate officer since the corporation did not exist, and thus he must have been functioning as a general partner of CPA. However, the assumption that, with the suspension of the corporate charter, Wilf was somehow transmuted into someone acting on behalf of CPA, lacks any logic. CPA had not been actively involved in this venture at all. Its essential function had been to hold ownership interests in Trenton, Inc. and Trenton, L.P. We can conceive of no basis for imposing liability on CPA, particularly since that imposition seems designed essentially to accomplish what the summary judgment motion in favor of Wilf had avoided: the imposition of personal liability against Wilf.
The reasoning set out under Point IA above, which correctly led the motion judge to grant summary judgment dismissing plaintiff's claim against Wilf, is equally applicable here. Both N.J.S.A. 14A:4-5(7) and Asbestos Workers Local Union No. 32 v. Shaughnessy, supra, require dismissal of plaintiff's complaint. The suspension of the corporate charter has no more significance respecting a claim against CPA than it had against Wilf.
The trial court found support for its imposition of liability on CPA by concluding that Wilf had consciously decided that the corporation should not file necessary reports or pay necessary taxes, and thus Wilf had deliberately brought about the charter suspension. The court also found, or at least implied, that Wilf had acted in bad faith by deliberately delaying reinstatement of the charter after his counsel had represented to the motion judge that the charter was in the process of being reinstated. We find no support for those conclusions.
First, we can conceive of no motive for Wilf to deliberately induce a charter suspension. That would produce no benefit of any kind to him and could only pose precisely the kind of personal liability threat that plaintiff is asserting here.
Beyond that, as noted, the record is devoid of any explanation as to how or why the charter was suspended. Absent any such explanation, the most likely conclusion would seem to be that the suspension resulted from an oversight by someone acting for Trenton, Inc., or, recalling the statement in the reinstatement proclamation (that the charter had been "voided in error"), that the "error" was made within the office of the Secretary of State. There is certainly no reason to find that Wilf intentionally brought about the suspension.
Nor is there any basis for finding that Wilf or his attorney were disingenuous in representing to the motion judge that charter reinstatement was imminent. The chronology does not support that conclusion.
Wilf's attorney made his statement on December 23, 1996. The reinstatement proclamation from the Secretary of State is dated March 13, 1997less than three months later. That would hardly seem an inordinate delay, and there is simply no basis for concluding that Wilf wanted to, or did, delay reinstatement of the charter.
In sum, just as there is no basis for a conclusion that Wilf at any time acted *616 other than as an officer of Trenton, Inc., so too there is no basis to conclude that CPA ever functioned as a general partner of Trenton, L.P. The finding to the contrary is unsupported and is reversed.

II
In addition to his claim based on suspension of Trenton, Inc.'s corporate charter, plaintiff claims the limited partnership statute imposes general partner liability on Wilf because he functioned as the operating head of the parties' renovation project. We find the claim inconsistent with both the policy and the language of the statute.
A basic principle of the Uniform Limited Partnership Law (1976), N.J.S.A. 42:2A-1 to -72, is a differentiation between the broad liability of a general partner for the obligations of a limited partnership (see N.J.S.A. 42:2A-32b), and the non-liability of a limited partner for such obligations. See N.J.S.A. 42:2A-27a. Preservation of that distinction and protection against imposing unwarranted liability on a limited partner has been a consistent concern of the drafters of the Uniform Act on which our New Jersey statute is based, and has been described as "the single most difficult issue facing lawyers who use the limited partnership form of organization." See Revised Unif. Limited Partnership Act, Prefatory Note preceding § 101, U.L.A. (1976) (hereinafter "Commissioners' Report"). Indeed, the history of the Uniform Limited Partnership Act, and thus the evolution of our New Jersey statute, shows a consistent movement to insure certainty and predictability respecting the obligations and potential liability of limited partners. The framers of the Act have accomplished that by consistently reducing and restricting the bases on which a general partner's unrestricted liability can be imposed on a limited partner. Under the present version of the Uniform Act, the imposition of such liability (absent fraud or misleading) is severely limited. Our New Jersey statute (as discussed below) reflects that same philosophy in the provisions of N.J.S.A. 42:2A-27a.[4]
The original version of the ULPA was adopted in 1916. That enactment dealt with the question of a limited partner's liability in one short provision. In Section 7 it said,
A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.
In 1976, the original ULPA was substantially replaced by a revised version (on which the New Jersey statute is based) which "was intended to modernize the prior uniform law." See Commissioners Report Prefatory Note preceding Section 101. One of the ways that modernization was effected was by a new Section 303, which replaced the old Section 7, and was adopted virtually verbatim as Section 27 of the New Jersey statute. Section 303 reads as follows:
[A] limited partner is not liable for the obligations of a limited partnership unless..., in addition to the exercise of his [or her] rights and powers as a limited partner, he [or she] takes part in the control of the business. However, if the limited partner's participation in the control of the business is not substantially *617 the same as the exercise of the powers of a general partner, he [or she] is liable only to persons who transact business with the limited partnership with actual knowledge of his participation in control.
The Commissioners' Report in the comment to Section 303 states:
Section 303 makes several important changes in Section 7 of the 1916 Act.... The second sentence of Section 303(a) reflects a wholly new concept.... It was adopted partly because ... it was thought unfair to impose general partner's liability on a limited partner except to the extent that a third party had knowledge of his participation in control of the business ..., but also (and more importantly) because of a determination that it is not sound public policy to hold a limited partner who is not also a general partner liable for the obligations of the partnership except to persons who have done business with the limited partnership reasonably believing, based on the limited partner's conduct, that he is a general partner.
Following that 1976 version, more limitations on a limited partner's liability came in 1988, with a series of "Safe Harbor" amendments, virtually all of which were adopted in New Jersey. See N.J.S.A. 42:2A-27b. The Commissioners' Report explained the reason for those additions to Section 303 of the Uniform Act:
Paragraph (b) is intended to provide a "Safe Harbor" by enumerating certain activities which a limited partner may carry on for the partnership without being deemed to have taken part in control of the business. This "Safe Harbor" list has been expanded beyond that set out in the 1976 Act to reflect case law and statutory developments and more clearly to assure that limited partners are not subjected to general liability where such liability is inappropriate.
Although plaintiff argues that Section 27 of the New Jersey statute imposes a general partner's liability on Wilf (and CPA) because Wilf took "part in the control of the business," we are satisfied that the argument has no merit.[5] To accept it, and impose such liability on the facts presented here, would reverse the evolution described above and create precisely the instability and uncertainty that the drafters of the ULPA (and the New Jersey Act) were determined to avoid.
Plaintiff's argument rests on Wilf's key role in the renovation project. Wilf acknowledges that role, but argues that his actions were taken as a vice president of Trenton, Inc.the corporation which was the sole general partner of Trenton, L.P. Wilf argues that since the corporation is an artificial entity, it can only function through its officers, see Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 761, 563 A.2d 31 (1989), and that is precisely what he was doing at all times when he acted concerning this enterprise. Wilf also points to the "Safe Harbor" provisions of N.J.S.A. 42:2A-27b to reinforce his claim that his actions here did not impose general partner liability upon him.
We agree with that analysis. As noted, the 1988 "Safe Harbor" provisions set out a number of activities which, under the statute, do not constitute participating in "the control of" a business so as to impose a general partner's liability on a limited partner. The provision to which Wilf particularly refers is subsection b(6) of section 27, which provides that,
b. A limited partner does not participate in the control of the business within the meaning of subsection a. solely by[,]
*618 * * *
(6) Serving as an officer, director or shareholder of a corporate general partner;
That provision clearly applies here and essentially undercuts plaintiff's argument: while plaintiff claims that Wilf's activities constitute "control" of the activities of Trenton, L.P., the statute says, in just so many words, that those activities do not constitute the exercise of control.
In addition to the "Safe Harbor" protections, section 27a itself sharply limits the circumstances under which the exercise of "control" could lead to imposition of general partner liability on a limited partner. It first provides that if a limited partner's control activities are so extensive as to be "substantially the same as" those of a general partner, that control, by itself, is sufficient to impose liability: i.e., if a limited partner acts "the same as" a general partner, he will be treated as a general partner. However, but for that extreme case, mere participation in control does not impose liability on a limited partner. Such liability may be imposed only as to "persons who," in essence, rely on the limited partner's participation in control and thus regard him as a general partner.
That limitation of liability to those who rely on a limited partner's exercise of control is critical to a sound reading of the statute. It is consistent with the series of amendments from 1916 to now, which have been designed to insure predictability and certainty in the use of the limited partnership form of business organization. To reject plaintiff's claim of liability would be consistent with that view of the statute. To accept the claim would inject precisely the instability and uncertainty which the statute is designed to avoid.
Here, there was none of the "reliance" which is a necessary basis for a limited partner's liability. It bears repeating that plaintiff, an insider in the project, does not claim he was ever misled as to the entities with whom he was dealing. Plaintiff is described as a sophisticated, experienced developer and businessman. He does not deny that description. He does not claim that he ever sought or obtained any individual guarantee or promise of payment from Wilf, and certainly not from CPA. Nor does plaintiff deny that he understood completely that he was dealing with a limited partnership and a corporation. He does not deny his understanding that those entities, by their very nature, provide limited resources and limited recourse for parties with whom they contract. See Frank Rizzo, Inc. v. Alatsas, 27 N.J. 400, 402, 142 A.2d 861 (1958), where the court, speaking of a corporation but employing language equally applicable to a limited partnership, noted that,
[o]rdinarily we do not think in terms of the possibility of individual liability of corporate officers for obligations incurred by the entity in the usual course of business. Such personal liability is inconsistent with the existence of a body corporate at common law and can emanate only from some positive legislative fiat.
In short, there is no claim that plaintiff was misled, or that he relied on some impression that Wilf was a general partner of Trenton, L.P., and thus there is no basis for any finding of personal liability against Wilf under N.J.S.A. 42:2A-27a.
The only other possible statutory basis for imposing liability on Wilf is the provision which would impose such liability if Wilf's activities were "substantially the same as the exercise of the powers of a general partner" of Trenton, L.P. While that phrase is less than precise, and we are aware of no helpful decision interpreting or applying it, we see no basis for its application here.
First, recall that Wilf's activities as an officer of Trenton, Inc., are specifically sanctioned by the "Safe Harbor" provisions. With the other corporate officers having abrogated their responsibilities, it is difficult to see, first, what other choice was available to Wilf; and second, why his *619 actions should have any adverse effect on him under the Limited Partnership Act.
Further, it is significant that plaintiff does not rest his argument so much on the powers and functions exercised by Wilf, as on the manner in which he exercised those functions. That is, the argument points mainly to Wilf's carelessness in not consistently and specifically identifying himself as an officer of Trenton, Inc., when he acted on behalf of Trenton, L.P. or signed documents on behalf of the limited partnership.[6] The argument, in short, refers more to form than to substance. It lacks force because, regardless of Wilf's alleged carelessness, plaintiff was at all times fully aware of what Wilf was doing and how he was doing it. A failure to comply with some designated formality might have had some significance if, at any time or in any way, it misled plaintiff or prejudiced him. But, as we have noted several times, that is simply not the case.[7]
Plaintiff cites three out-of-state cases in support of his argument against Wilf and CPA. We find all of them either distinguishable or, for other reasons, non-persuasive.
One such case is Delaney v. Fidelity Lease Ltd., 526 S.W.2d 543 (Tex.1975), where the court questioned whether, under Texas Law, a corporation could serve as the sole general partner of a limited partnership. The court held that, if it were possible for a limited partnership to function in that manner, a corporate officer who took "part in the control of" the limited partnership through acting as an officer of the corporate general partner would become liable to third parties to the same extent as if he himself had been a general partner of the limited partnership.
The most obvious difference between Delaney and our case is the absence of any Texas statute comparable to the "Safe Harbor" provision discussed above. That provision dictates a conclusion precisely the opposite of that reached in Delaney. In short, the Texas court was dealing with a significantly different statute. Its conclusion may have been appropriate there; it is not appropriate here.
The second case cited by plaintiff is Hommel v. Micco, 76 Ohio App.3d 690, 602 N.E.2d 1259 (1991). There, the individual defendants, Micco and Buescher, were limited partners in an operating entity and the general partner of that entity was another limited partnership, Harbor Creek Company. The general partners of the second entity were two corporations, one controlled by Micco and the other by Buescher.
The court imposed individual liability on Micco and Buescher because they had controlled the operating limited partnership. The court did not refer to a "Safe Harbor" provision comparable to N.J.S.A. 42:2A-27b(6), but in any event, since the general *620 partner of the operating entity was not a corporation, but rather another limited partnership, it is not clear whether even "Safe Harbor" provisions such as those in our statute would have applied in Hommel.
Further, the court emphasized that Micco and Buescher had not made the plaintiff aware of the capacity in which they were operating. Since the plaintiff was an outsider, there was no basis to assume he understood the business organizations with which he was dealing, or that limited liability might be applied respecting his contract. That, of course, is completely different from our case, where plaintiff was an "insider" and was fully aware of all the entities involved.
The third case relied on by plaintiff is Gonzalez v. Chalpin, 77 N.Y.2d 74, 564 N.Y.S.2d 702, 565 N.E.2d 1253 (1990). There, the plaintiff, who had contracted with a limited partnership, sought to hold defendant Chalpin to a general partner's liability because Chalpin had directed some of the activities of the limited partnership in his capacity as the sole shareholder, director and officer of its corporate general partner. New York apparently has no "Safe Harbor" provision comparable to N.J.S.A. 42:2A-27b(6), and that may account for the court's seemingly suspicious, or hostile, approach to Chalpin's defense. It referred to Chalpin as attempting to "elude" personal liability and held that any limited partner who maintained he had been functioning as an officer of a corporate general partner "bears a heavy burden when seeking to elude personal liability." The court found that Chalpin had not met that "heavy burden," and thus imposed personal liability on him. Again, the significantly different statute is what probably accounts for an approach and a conclusion which may have been appropriate in the case before that court but is not appropriate here.
Wilf, on the other hand, relies on two cases which we find well reasoned and persuasive. One is Frigidaire Sales Corp. v. Union Properties, Inc. 88 Wash.2d 400, 562 P.2d 244 (1977), where a limited partnership had contracted with plaintiff Frigidaire. The limited partnership had two individual limited partners and one corporate general partner. The two limited partners were also the sole shareholders, officers and directors of the general partner, and by acting on behalf of the corporation, they controlled the activities of the limited partnership.
Frigidaire claimed that by their actions, the limited partners had become liable as though they were general partners. In support of its argument, it cited the Texas case discussed above, Delaney v. Fidelity Lease Ltd. The Washington Supreme Court, however, held that Washington law permitted a corporation to function as a general partner of a limited partnership; that by acting as officers and directors of the corporate general partner, the limited partners had not assumed general partner liability; that Frigidaire had been fully aware of the capacity in which the individual defendants had been acting; and thus Frigidaire had no personal liability claim against the limited partners.
The court declined to follow Delaney. It found that case distinguishable because there the plaintiff had not been fully aware of the status of the entities with whom it was dealing, and also because it found no impediment under Washington law to a corporation serving as general partner of a limited partnership. That the court reached that conclusion even before the ULPA had been amended to include the "Safe Harbor" provisions discussed above, is particularly significant and, we find, particularly persuasive.
Plaintiff's second cited case, Western Camps, Inc. v. Riverway Ranch Enterprises, 70 Cal.App.3d 714, 138 Cal.Rptr. 918 (Cal.Ct.App.1977) is also persuasive. There, defendant Riverway, a limited partnership, had executed a lease with plaintiff. The sole general partner of Riverway was CRC, a corporation. Defendant McCoy was a limited partner in Riverway *621 but also was an officer, director and shareholder of CRC. It was he who, essentially, directed the activities of Riverway.
Plaintiff claimed that because of McCoy's activities, he was responsible to the same extent as a general partner of Riverway. The case predated any "Safe Harbor" provisions, and the court framed the issue as calling for a choice between two conflicting decisions: that of the Texas court in Delaney v. Fidelity Lease Ltd. or the Washington court in Frigidaire Sales Corp. v. Union Properties.
The California court found the Frigidaire reasoning more persuasive. It concluded that the absence of "fraud, wrong or injustice," and full disclosure of the individuals and entities with whom the plaintiff was dealing, were the critical factors. It found no "fraud or injustice" inherent in an individual having two roles in a business transaction: one as a limited partner, and one as an officer or director of a corporation functioning as a general partner. Provided only that the other party was not misled, the court found no basis to impose liability.
Finally, we note two cases which particularly emphasize and relate to the need for certainty and predictability in defining a limited partner's liability for actions of a limited partnership entity.
Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir.1996) concerned a claim for contribution to environmental cleanup costs under the federal Comprehensive Environmental Response Compensation and Liability Act (CERCLA). The issue before the court was whether, in determining a limited partner's liability for such payments, the court should apply state law (there the law of Alabama) or develop a federal common law.
The court concluded there was no need to develop a federal common law since, "there is significant agreement among the 50 states and the District of Columbia on the broad outlines of a rule governing the liability of limited partners. This is because nearly every jurisdiction in this country has adopted a version of the Revised Uniform Limited Partnership Act of 1976 (RULPA)." Id. at 1501 n. 14. Noting the importance of stability and the avoidance of uncertainty respecting the critical question of limited partner liability, the court concluded that it should avoid developing a new federal common law, which would inevitably contribute to just such uncertainty and instability:
What makes [limited] partnerships ... attractive to investors is the very concept of limited liability: as limited partners, investors can participate in the partnership's profits without exposing themselves to liability for the partnership's debts. When determining whether to enter a limited partnership, however, investors naturally evaluate their ability to control their risk by participating in the management of the partnership. Existing state limited-partnership statutes define how far a limited partner can go in managing the partnership's business without losing its limited liability status. Given the popularity of the limited-partnership structure as a means of organizing businesses and attracting investment in this country, we hesitate to upset the expectations investors have under current state law rules by adopting a federal common law rule.

[Id. at 1502.]
Antonic Rigging & Erecting of Missouri, Inc. v. Foundry East Limited Partnership, 773 F.Supp. 420 (S.D.Ga.1991), expresses similar thoughts, although it involved a Georgia statute significantly different from the Uniform Act. There, the court noted that in adopting its current version of the limited partnership statute, Georgia had specifically renounced the proposition that, "a limited partner may be held liable as a general partner for participating in the control of a limited partnership's business." Id. at 431. The court quoted the report of the Joint Legislative *622 Committee which had produced the new statute and which had pointed out that,
Under most modern limited partnership statutes, the "control" rule has been diminished to the point where there is no liability for participation in control without creditor reliance, and an extensive "safe harbor" is usually provided. Even so, uncertainty as to the degree of control which can trigger liability creates significant disincentive to limited partnership investments, and accordingly the proposed new law eliminates the control test.[8]

[Ibid.]
We are satisfied that, were we to find individual liability against Wilf because of his "control" here, we would be encouraging precisely the instability and uncertainty which are anathema to widespread use of the limited partnership as a business entity. The modern, sound view, epitomized by the ULPA, the New Jersey statute and the well reasoned decisions discussed above is in the other direction: to curtail the threat of personal liability unless there is some "reliance on the part of the outsider dealing with the limited partnership." There was no such reliance here, and there is no basis for imposing personal liability on Wilf.

III
Plaintiff also claims that Wilf incurred personal liability by causing Trenton, L.P. (and Trenton, Inc.) to terminate his consultation contract. However, although there is no question that Wilf caused both of those entities to breach plaintiff's contract, there is no basis to conclude that when he did so, Wilf was acting in any capacity other than as a corporate officer of a general partner. And, while there is no New Jersey decision precisely on point,[9] we are satisfied that clearly established general principles of corporate law, well reasoned authority elsewhere, and New Jersey case law, all make clear that an officer who causes his corporation to breach a contract for what he conceives to be the best interest of the corporation does not thereby incur personal liability.
The reasoning of the Oregon Supreme Court in Welch v. Bancorp Management Advisors, Inc., 296 Or. 208, 675 P.2d 172 (1983), is on point and persuasive. There, the court spoke of the necessity for corporations to act through their officers, and the need for officers to be able to act for the best interests of those corporations:
A corporation can only act upon the advice of officers or employees and through the actions of agents. Doing business through corporate structures is a recognized and necessary incident of business life. A party is usually able to abandon a disadvantageous but valid contract and be responsible for breach of contract only. Corporations would substantially be prevented from similarly abandoning disadvantageous but valid contracts, and from securing related business advice, if the officers and employees who advised and carried out the breach had to run the risk of personal responsibility in an action for interference with contract. Therefore, courts have tended to shield such persons from responsibility for inducing breach of the corporate contract, often saying that they are not liable if the action was *623 taken in "good faith" and for the benefit of the corporation.
[675 P.2d at 177 (quoting from Wampler v. Palmerton, 250 Or. 65, 439 P.2d 601, 607-08 (1968)).]
The Oregon court rejected a proposed immunity test which would have inquired whether the "primary motive" of the officer was to serve the corporation and not his own interest. Rather, it held, the individual officer will be protected from personal responsibility even if he is motivated by his own interests as well as those of the corporation, so long as his personal interests are not adverse to those of the corporation:
[M]ost corporate officers and employees have some personal interest in the financial welfare of their principal. Thus, if good faith were equated with lack of any selfish interest in enhancing the financial condition of a corporation, most officers or employees would not dare to give the business advice that it is their duty to render.

[Ibid.]
Therefore, the court said, the "good faith" which is necessary to immunize a corporate officer from personal liability for the corporation's breach of a contract, "means no more than intent to benefit the corporation and is not equated with absence of a personal interest in the financial welfare of the corporation." Ibid. The proper test, the court concluded, is
whether the agent acts within the scope of his authority and with the intent to benefit the principal. When this test is met an agent is not liable to a third party for intentional interference with contract even if the agent acts with "mixed motives" to benefit himself or another principal as well.

[Id. at 178.]
The New York case of Citicorp Retail Services, Inc., v. Wellington Mercantile Services, Inc., 90 A.D.2d 532, 455 N.Y.S.2d 98 (1982) is similar. There too, the court noted the general principle that,
Officers, directors or employees of a corporation do not become liable to one who has contracted with the corporation for inducing the corporation to breach its contract merely because they have made decisions and taken actions that resulted in the corporation's breaching its contract.... The rule in New York is that "[A] corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer ... [and did not commit] independent torts or predatory acts directed at another."
[Id. at 533, 455 N.Y.S.2d 98 (citation omitted).]
Under that standard, the court dismissed a third party complaint against the defendant corporate officers and agents because it had not been "sufficiently alleged that their acts were taken outside the scope of their employment or that they personally profited from their acts." Ibid. While the court did not articulate the rule as precisely as did the Oregon Supreme Court in Welch, the rule it applied was the same: to impose individual liability there must be an absence of good faith, which means, essentially, that the officer acted contrary to the interests of the corporation.
Plaintiff claims that Pennington Trap Rock Co. v. Pennington Quarry Co., 22 N.J. Misc. 318, 38 A.2d 869 (Sup.Ct.1944), supports its position. We disagree. We believe that Pennington is consistent with the general rule that absolves a corporate officer from breach of contract liability when he acts for what he conceives to be the best interest of the corporation. It suggests a possible imposition of tort liability against an individual officer or director for "wrongful" (that is, tortious) activity only where such activity goes well beyond mere breach of contract.
In Pennington, defendant Gilbert was the sole stockholder in a corporate defendant which had leased a quarry and its operating equipment from plaintiff. Plaintiff *624 sued the corporate tenant for breach of contract, but in separate counts of the complaint, also charged Gilbert with tortious actions taken to damage plaintiff's property and business interests. It claimed that Gilbert had directed the "demolition of parts of the machinery and equipment leased to the corporate defendant" and caused damage to the buildings and the quarry equipment which had depreciated the value of the leased property. It also charged Gilbert with doing that in order to establish a crushed stone monopoly, and "to eliminate plaintiff as a future competitor." Id. at 319-20, 38 A.2d 869.
Gilbert answered plaintiff's complaint by claiming he was
relieved of any responsibility and liability because the acts complained of represent violations of covenants contained in the written lease existing between the corporate parties and that he is further relieved because whatever was done was done by the corporation and no personal liability attaches to a stockholder, officer or director thereof.
In discussing that defense, the court noted the general rule that "an employee or officer of a corporation who acts in good faith and believes that what he does is for the best interests of the corporation in seeking to have the corporation breach its contract with a third party should be absolved from a suit of this character...." Id. at 321, 38 A.2d 869. Not surprisingly, however, the court rejected defendant's extraordinary claim that he could avoid tort liability for the wrongful acts he committed, simply by saying he had been acting for his corporation. For those acts, the court found there would be personal liability.
It is difficult to see how anyone could rationally argue against the finding of liability in Pennington. But that does not mean, nor did the Pennington court suggest, that a simple corporate breach of contract can provide a basis for either tort or contract liability against a corporate officer who effected that breach in a good faith effort to further the interest of the corporation. Rather, the court's reasoning makes clear that the Pennington holding is not inconsistent with the other cases discussed above and the established rule that a director or officer acting for his corporation does not incur individual liability simply by causing that corporation to breach its contract with another entity.[10]
In sum, Wilf's decision to terminate payments to plaintiff provides no basis for imposing personal liability on him. His decision may have been misguided, it may even have been arrogant, and it did result in a jury conclusion that the corporate and limited partnership action taken as a result thereof constituted a breach of contract. But there is no basis for a claim that in doing what he did, Wilf was acting other than in his capacity as a corporate officer of the sole general partner of Trenton, L.P. There is no basis to conclude that he acted to benefit himself rather than the corporation or the limited partnership.
Finally, we note that acceptance of plaintiff's argument to hold Wilf liable for the tort of interference with a contract, would mean that virtually any corporate officer who caused his corporation to breach a contract would be subjected to this tort claim. The principle set out in Printing Mart-Morristown v. Sharp Electronics Corp., supra, which bars a tort claim against one of the parties to an allegedly breached contract, would have a strangely skewed application. It would apply to any contract executed (and allegedly breached) by an individual party, but as concerns a corporate party, its effect would be limited indeed. While the corporate party itself would remain immune from such a tort claim, the persons acting for the corporation would be exposed to a personal liability which they never anticipated *625 and to which they had theretofore not been subject. We see no merit in such a rule; rather we see precisely the kind of uncertainty and instability which courts should strive to avoid in these complex financial undertakings. See Asbestos Workers Local Union No. 32 v. Shaughnessy, supra, 306 N.J.Super. at 4, 703 A.2d 276; Redwing Carriers, Inc. v. Saraland Apartments, supra, 94 F.3d at 1502. Accordingly, we reject plaintiff's proposed theory of liability and conclude that Wilf's causing the limited partnership and corporation to breach plaintiff's consulting contract imposed no personal liability upon him.

IV
Plaintiff raises some additional issues which require only brief discussion.
First, as noted above, plaintiff claims that after Wilf paid off a $2.4 million loan to First Chicago Bank, he obtained in exchange a mortgage of $3,063,000 from Trenton, L.P. Thus, plaintiff claims Wilf "over-mortgaged" the property by $600,000.
As also noted, Wilf apparently claims the mortgage included both his payment to First Chicago and an additional $600,000 which his company paid into the project. Wilf also says, however, that even assuming the alleged "over-mortgaging," there has been no payment on the principal of that mortgage. Interest he has received totals far less than the $2.4 million he laid out, and thus Trenton, Inc., and Trenton L.P., are far ahead in what Wilf characterizes as a paper transaction. He adds further that it is highly unlikely he will ever realize any portion of the principal of that mortgage since the current appraised value of the property is $2,600,000 and the prior first mortgage held by the EDA is for $5.2 million.
We need not determine the accuracy of those estimates and claims. Suffice it to say that if and when Wilf attempts to foreclose or otherwise collect on that mortgage, he will be required to demonstrate the amount due, and plaintiff (or anyone else with an interest in the mortgaged property) will have an opportunity to present any defense or basis for reducing the amount of the mortgage.
Second, plaintiff refers to claims he raised that Wilf used Trenton, L.P. funds to meet his own personal expenses; that he had his own company contract with Trenton, L.P. on a less than arm's length basis; and that Wilf engaged in other improper acts which require an accounting by Wilf to Trenton, L.P. and Trenton, Inc.[11] Plaintiff had also requested dissolution and liquidation of Trenton, L.P. and Trenton, Inc., and during trial, the court indicated its intention to deal with those requests at the trial's conclusion so that an accounting could be performed as part of the liquidation and the claims of diversion could be reversed at that time. The intervening bankruptcies of Trenton, L.P. and Trenton, Inc., however, prevented such a liquidation, dissolution and accounting.
As a result of the foregoing, plaintiff moved after trial to dismiss "without prejudice" what he described as "the claims asserted in Courts Five and Six of the Amended Complaint, which seek a determination that Trenton, L.P., and its general partner ... [Trenton, Inc.] should be liquidated and a receiver appointed." Wilf did not oppose that request. However, when the trial court signed the order submitted by plaintiff's counsel, (which provided for a dismissal of Counts Five and Six without prejudice) the court changed the order to direct that the dismissal be "with prejudice." Neither then nor at any subsequent *626 time did the court provide any reason for that change.
Plaintiff claims that the dismissal should be "without prejudice," so that, if and when the bankruptcy proceeding is dismissed, plaintiff may proceed to seek dissolution, the appointment of a receiver and an accounting in Superior Court respecting both Trenton, L.P. and Trenton, Inc. We express no opinion as to whether plaintiff might be successful in seeking that relief. However, it is clear that the dismissal order "with prejudice" was unanticipated andso far as appearstotally unjustified. It was requested by neither side, and we can conceive of no reason why the trial court, sua sponte, should have converted an unopposed motion for dismissal without prejudice into one granting dismissal with prejudice. Accordingly, the court's order of September 25, 1998, providing for dismissal of Courts Five and Six of plaintiff's amended complaint "with prejudice" must be vacated and the matter remanded for entry of a new order directing that the dismissal be "without prejudice."
Finally, we note plaintiff's claim that, even if this court rejects the arguments it submitted and developed here and in the trial court, there are ample other bases for awarding the relief he seeks. Plaintiff refers to theories of piercing the corporate veil, fraud, conversion, breach of fiduciary duty and breach of trust. None of those theories have been developed and none provides any substance beyond the arguments discussed and resolved above. We are satisfied that all such additional issues referred to by plaintiff are clearly without merit, have no precedential value and thus require no further discussion in this opinion. R. 2:11-3(e)(1)(E).
The summary judgment in favor of defendant Wilf is affirmed, as is the judgment against Trenton, L.P. and Trenton, Inc. The judgment against defendant CPA is reversed. The matter is remanded to the trial court so that the order dismissing Counts Five and Six of plaintiff's amended complaint may be modified to provide that the dismissal is without prejudice rather than with prejudice. We do not retain jurisdiction.
NOTES
[1] The name of the limited partnership was changed twice and at one point, its charter was suspended for failure to file an annual report. The charter was subsequently reinstated and, although plaintiff stresses that it was Wilf who effected the name changes, neither the charter suspension nor the name changes have any significance on the issues presented on appeal.
[2] The numbers do not precisely match and, as discussed further below, plaintiff charges Wilf with "over-mortgaging" the property for his own benefit. Wilf said at trial that he had negotiated the First Chicago payoff amount down to $2,434,000 before paying it off.
[3] In granting pretrial summary judgment to Wilf, the motion judge noted first the irrelevancy of the charter suspension because the alleged contract breach had occurred four years prior to the suspension. He then noted that Wilf's counsel had represented that he was in the process of having the charter reinstated, and that, pursuant to the statute (Asbestos Workers had not been decided), the anticipated reinstatement would be effective retroactively. It is not clear whether the court accepted that representation as the equivalent of actual reinstatement, and based its decision in part on such presumed reinstatement. However, the fact is that within three months thereafter, the charter was reinstated, and thus all interim acts of the corporation were validated.
[4] The title of the New Jersey statute is the Uniform Limited Partnership Law (1976). The New Jersey statute is based on, and in most respects identical with, the Uniform Act compiled by the National Conference of Commissioners on Uniform State Laws. The Act composed by the Commissioners is sometimes referred to as the Revised Uniform Limited Partnership Act (1976). To minimize confusion in reference to one or the other, we shall refer to the New Jersey statute as "The New Jersey Act" or the "New Jersey statute" and reserve the term "Uniform Limited Partnership Act" (or ULPA) for the model composed by the Commissioners on Uniform State Laws. At times we may also refer to specific provisions of the New Jersey statute or the ULPA by reference only to particular sections: viz., Section 27 of the New Jersey statute or Section 303 of the ULPA.
[5] In reality, as noted above, Wilf was neither a limited partner in Trenton, L.P., nor a shareholder in Trenton, Inc. Both of those roles were filled by CPA, Wilf's family entity in which he was a general partner. In view of our resolution of the substantive issues of the case, we have treated Wilf and CPA interchangeably, although Wilf argues that any assumed finding of liability against CPA would not apply to him.
[6] Plaintiff even claims that during pre-trial depositions, Wilf said he did not know of the existence of Trenton, Inc., or that he was an officer of that corporation. However, the testimony referred to indicates nothing more than a momentary confusion or uncertainty regarding the similar names of the entities involved and does not support a conclusion that Wilf was unaware of the existence and identity of either Trenton, Inc. or Trenton, L.P.
[7] The 1976 version of the Uniform Act was amended in 1985, to eliminate entirely the reference to a limited partner's control activities being "substantially the same as the exercise of the powers of a general partner." Thus, the present version projects liability on a limited partner only if an outsider "reasonably [believed], based upon the limited partner's conduct, that the limited partner is a general partner." The purpose of the amendment, quite clearly, is to make even clearer the points noted in the comments quoted above: it "is not sound public policy" to hold a limited partner to a general partner's liability, unless he has misled others into believing he was a general partner. See Revised Unif. Limited Partnership Act, supra, Prefatory Note preceding Section 101.

Although New Jersey has not (yet) adopted the 1985 amendment, neither has it rejected the proposal, and there is no reason to conclude that New Jersey's Section 27 is not consistent with both the presently existing Section 101 and its earlier version.
[8] The court also noted that "Georgia's abandonment of the control rule is consistent with the criticisms by many commentators," citing Basile, Limited Liability for Limited Partners: An Argument for the Abolition of the Control Rule, 38 Vand. L.Rev. 1199 (1985).
[9] In Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 563 A.2d 31 (1989), the Court held that a party to a contract cannot be held liable in tort for interference with the performance of that contract. The Court posed the question of application of that rule to a possible charge of tortious interference against an officer or employee of a corporate party to a contract, but, because the issue was not before the Court, it declined to provide an answer.
[10] It should be understood that the court which decided Pennington was not our present Supreme Court, but rather a court which was then functioning as a trial court prior to the 1947 reorganization of this state's judicial system.
[11] Plaintiff also charged that Wilf was motivated to terminate plaintiff's consulting contract payments so he could divert that money from Trenton, L.P. to himself or his own entities. Wilf correctly notes that plaintiff produced no evidence to support that claim, nor did plaintiff charge or demonstrate that any of the alleged diversions of funds contributed to the demise of either Trenton, L.P. or Trenton, Inc.