

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-2004

# Fields v. Thompson Printing Co

Precedential or Non-Precedential: Precedential

Docket No. 02-2763

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Fields v. Thompson Printing Co" (2004). *2004 Decisions.* Paper 878.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/878

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-2763 and 02-2764

GERALD E. FIELDS

v.

THOMPSON PRINTING
COMPANY, INC.;
GILBERT M. THOMPSON,
Appellants No. 02-2763

GERALD E. FIELDS,
Appellant No. 02-2764

v.

THOMPSON PRINTING CO;
GILBERT M. THOMPSON

Appeals from the United States
District Court for the
District of New Jersey
(D.C. Civil No. 99-cv-03743)
District Judge:  Honorable
Alfred M. Wolin

Argued November 18, 2003

Before:  RENDELL, BARRY and
CHERTOFF, Circuit Judges.

(Filed March 31, 2004)

Anthony F. Malanga, Jr.    **[ARGUED]**
Gaccione, Pomaco & Malanga
524 Union Avenue
P.O. Box 96
Belleville, NJ  07109
    *Counsel for Appellants/Cross Appellees*

Noel E. Schablik    **[ARGUED]**
20 Waterview Boulevard, 3rd Floor
Parsippany, NJ  07054
    *Counsel for Appellee/Cross Appellant*

OPINION OF THE COURT

RENDELL, Circuit Judge.

These appeals come to us from the District Court's order enforcing the language of an employment contract, rejecting Thompson Printing Company's ("TPC") entreaties that doing so would violate implied covenants and public policy.  The District Court granted partial summary judgment in favor of the employee, Gerald Fields ("Fields").  Both defendants, TPC and its CEO, Gilbert M. Thompson ("Thompson"), appeal.  For the reasons that follow, we will affirm in part, and reverse and remand in part.

I. The Factual Situation

TPC is a closely held corporation.  Thompson owned 80 of the 100 outstanding shares, and Fields owned the remaining 20.  Fields started working for

TPC in 1955 at age 13. On May 7, 1990, he entered into a four-page Employment Contract with TPC. It provided that Fields was to have the "designated titles" of Vice President and Chief Operations Officer, and that he was to "perform the duties attendant thereto." The agreement defined the term of employment as continuing until June 14, 2000, and detailed compensation and other benefits to which Fields would be entitled in exchange for his services.[1] It also provided for annual raises of ten percent each year during the 10-year term, and, further, that in the event of Thompson's death, Fields's salary would be doubled within 30 days. The Contract gave TPC the right to discontinue the

---

[1]The Contract provided Fields with a starting annual salary of $131,000, inclusion in any and all employee benefit programs and packages, annual vacation leave, a credit card for his use, a new car - "a Cadillac or the equivalent at [Fields's] choice" - every four years, a second vehicle (every time TPC provided Fields with a new car, the old vehicle which was being replaced would become the second vehicle), death benefits for Fields's wife in the event that he died prior to retirement, and retirement benefits. Commencing after the ten-year term, his retirement benefits included a $2,000/week payment, the continued use of the credit card, the continued use of the two cars (with a new car every sixth year, instead of every fourth year), and continued medical benefits with the premiums to be paid by TPC.

contractual benefits in the event of Fields's voluntary termination:

If during the term of this Contract, Jerry [Fields] voluntarily terminates his employment with Thompson [Printing Company], then it is understood by and between the parties hereto that the salary compensation, employment benefits, and all retirement benefits shall cease as of the date of the termination.

It also contained a broad non-forfeiture clause in favor of Fields:

This Contract shall be non-terminable by Thompson [Printing Company]. In the event Thompson [Printing Company] shall terminate the employment of Jerry [Fields], all of the benefits as contained herein shall continue in accordance with the terms and provisions of this Agreement.

The Contract did not differentiate between termination with or without cause, providing for continuation of the benefits simply if TPC "shall terminate" Fields.

On August 11, 1997, three female employees made allegations to Thompson, then CEO, that Fields, by now titled TPC's President, had sexually harassed them by creating a hostile work environment. On August 13, Thompson telephoned Fields, who was vacationing with his family, and fired him. TPC refused to pay Fields any further compensation under the Employment Contract after that date.

The three female employees filed a lawsuit, Zarillo v. Thompson Printing Co., L-9076-97, in the Superior Court of New Jersey against TPC, Fields, Thompson and another supervisor. No findings were made since the claims were settled without any admission of wrongdoing by any of the defendants.

While the Zarillo lawsuit was still pending, Fields commenced a civil action against TPC and Thompson in the United States District Court for the District of New Jersey. He asserted a federal claim under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., contending that the retirement benefits specified in the Employment Contract were protected by ERISA, and that TPC's failure to pay those benefits violated the statute. In addition, he sought reinstatement of his salary and benefits, including some that had accrued prior to his termination and had never been paid, under a variety of state law theories, including the New Jersey Wage Law, N.J. Stat. Ann. § 34:11-4.3, breach of contract, unjust enrichment, conversion, quantum meruit, and breach of the covenant of good faith and fair dealing. He also asserted a minority shareholder oppression claim under N.J. Stat. Ann. § 14A:12-C-7(1)(c), arguing that his rights as a minority shareholder had been violated by Thompson's actions.

Thompson and TPC replied, denying Fields's allegations and claiming that Fields's ERISA claim was barred by 29 U.S.C. § 1003(b), and that his state law claims were barred by New Jersey's "entire controversy" doctrine. Furthermore, they claimed that Fields had breached the Employment Contract by engaging in acts of sexual harassment, terminating Fields's rights, as well as their obligations, under the Contract.

The parties then filed cross motions for summary judgment. Defendants' Statement of Uncontested Material Facts detailed the allegations of the Zarillo plaintiffs.[2] Defendants argued that by his actions Fields had breached the Employment Contract, forfeiting his rights under the agreement and warranting the entry of summary judgment in their favor. However, Fields claimed that not only were the facts in dispute, but they were not material to the resolution of his claims because the Employment Contract guaranteed that if he was terminated by

_____

[2] One employee claimed that Fields had grabbed her buttocks on one occasion and attempted to touch her breast on another, and had repeatedly made lewd and sexually suggestive comments. Several incidents were specifically outlined, such as Fields's request, during the company's search for a part-time receptionist, to let him know if any of the applicants had big breasts so that he could come out to look. Another plaintiff alleged that Fields repeatedly told her to wear short skirts, one time going so far as to draw a line on a wall and say, "I don't want your skirt to be below that line." She also claimed that Fields attempted to pull up her skirt on at least two occasions.

3

TPC, his benefits were to continue.

The District Court granted Fields's summary judgment motion with regards to his ERISA, New Jersey Wage Law, breach of contract, unjust enrichment and quantum meruit claims, but denied the motion with respect to the oppression claim. The Court held that the entire controversy doctrine was inapplicable as "the validity of the sexual harassment claims [was] entirely immaterial to the adjudication of the parties' rights and obligations under the Employment Agreement." It then determined that, under the plain language of the Contract's non-forfeiture clause, Fields was entitled to both retirement and pre-retirement benefits, rejecting defendants' arguments that enforcing the agreement would violate public policy or that Fields had breached the agreement. It also held Thompson jointly and severally liable based on its view that Thompson had not drawn any distinction between himself and TPC, so both were liable. Subsequently, Fields dismissed the oppression claim, and the parties agreed upon the amount of compensation due under the Contract, but reserved the right to appeal the District Court's ruling.

The District Court had jurisdiction over Fields's ERISA claim pursuant to 29 U.S.C. § 1132, and over the state law claims pursuant to 28 U.S.C. § 1367. We have appellate jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

TPC and Thompson now appeal the District Court's order granting partial summary judgment. They essentially raise three issues, namely, whether the Court erred in determining 1) that Fields's suit was not barred by the entire controversy doctrine; 2) that TPC was obligated to pay Fields the compensation; and, 3) that Thompson should be held personally liable. Fields cross-appeals the District Court's determination that he was not entitled to attorneys' fees under ERISA, contending that its analysis was flawed, based on existing case precedent.

Our review of an order granting summary judgment is plenary. Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir. 2003). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a dispute regarding a material fact exists, we draw all reasonable inferences in favor of the non-moving party. Morton, 343 F.3d at 680.

## A. The Entire Controversy Doctrine

We first address defendants' argument that the New Jersey entire controversy doctrine required Fields to bring his claims against TPC and Thompson as cross-claims in the Zarillo sexual harassment action, and that because he did not do so, application of the doctrine results in the preclusion of those claims.

4

The entire controversy doctrine is currently codified in Rule 4:30A of the New Jersey Rules of Civil Procedure, which provides that "[n]on-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine." The doctrine "seeks to assure that all aspects of a legal dispute occur in a single lawsuit." Olds v. Donnelly, 696 A.2d 633, 637 (N.J. 1997). Its purposes "are threefold: (1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation." Mystic Isle Dev. Corp. v. Perskie & Nehmad, 662 A.2d 523 (N.J. 1995). The doctrine is essentially a rule of mandatory joinder of claims and parties, which precludes non-joined claims from being brought at a later date. We have characterized it as "New Jersey's specific, and idiosyncratic, application of traditional res judicata principles." Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 886 (3d Cir. 1997). Over the years, New Jersey courts have extended the doctrine to related claims, defenses, counterclaims and cross-claims. See Massari v. Einsiedler, 78 A.2d 572 (N.J. 1951) (defenses); Ajamian v. Schlanger, 103 A.2d 9 (N.J.), cert. denied, 348 U.S. 835 (1954) (related claims); Vacca v. Stika, 122 A.2d 619 (N.J. 1956) (counterclaims). Thus, the doctrine applies to "virtually all causes, claims, and defenses relating to a controversy between the parties engaged in litigation." Cogdell v. Hospital Center, 560 A.2d 1169, 1173 (N.J. 1989).

The New Jersey Supreme Court has stated that "[i]n determining whether successive claims constitute one controversy for purposes of the doctrine, the central consideration is whether the claims . . . arise from related facts or the same transaction or series of transactions." DiTrolio v. Antiles, 662 A.2d 494, 502 (N.J. 1995). Thus, we must determine whether the facts giving rise to Fields's claims against TPC and Thompson also gave rise to the Zarillo plaintiffs' claims against TPC, Thompson and Fields in the earlier action. TPC urges that absent the alleged behavior at the center of the sexual harassment claims, Fields would not have been terminated and he would not have brought suit against TPC and Thompson. While this is no doubt true, the causal relationship between the two sets of claims is not conclusive under New Jersey law. Rather, "[t]he issue is, basically, whether a sufficient commonality of facts undergirds each set of claims to constitute essentially a single controversy that should be the subject of only one litigation." DiTrolio, 662 A.2d at 497.

Here, no such "commonality of facts" exists, as the facts requiring determination in Fields's ERISA and breach of contract action are quite separate from the facts that would have been determined in the Zarillo action. There, the plaintiffs blamed TPC for the

discriminatory and hostile work conditions, and the Superior Court was interested in the nature of the work environment and what TPC did to address the female employees' complaints, while, in the instant case, we are interested in the language of the Employment Contract and the parties' rights and obligations under that Contract and ERISA.[3] Cases in which the New Jersey courts have applied the entire controversy doctrine to bar a second suit have been characterized by some duplication of proof. For instance, in DiTrolio, the second action was found to "require[] the production of substantially the same evidence that would be adduced in the first action." Id. at 507. And, in Mystic Isle, forcing the two claims to be brought at the same time "would have resulted in a more comprehensive determination of the underlying legal controversy." 662 A.2d at 531. New Jersey's application of the entire controversy doctrine "emphasize[s] the essential unfairness of forcing parties and courts to rerun a course previously run." Joel v. Morrocco, 688 A.2d 1036, 1040 (N.J. 1997). Here, given that two different sets of facts are relevant to the two different types of claims, there is no reason to believe that the New Jersey courts

would bar the suit to enforce the Employment Contract on the theory that a "comprehensive determination" should have been sought in the Zarillo litigation.

Our decision in Fornarotto v. American Waterworks Co., 144 F.3d 276 (3d Cir. 1998) is also instructive. There, Fornarotto, an employee of a subsidiary of American Waterworks Company ("AWC"), was struck by an automobile driven by Chiapetta, also an employee of the AWC subsidiary. Id. at 277. In 1990, Fornarotto filed a personal injury suit against the AWC subsidiary and Chiapetta, who he claimed had been acting in the course of his employment. Id. Fornarotto attempted to return to work, but complications from his injuries eventually forced him from the job. In 1995, he filed a complaint against AWC under the civil enforcement provisions of ERISA, seeking disability benefits. Id. at 278. In 1996, Fornarotto settled the personal injury suit. Id. Shortly thereafter, the defendants in the ERISA suit moved for, and the district court granted, summary judgment on the ground that the ERISA claim arose from the same set of facts as the personal injury claim and was therefore barred by the New Jersey entire controversy doctrine. Id.

We reversed, holding that the personal injury suit and the disability suit did not turn on the same transactional facts. Id. at 280. While the injuries suffered were relevant to both suits, the issue of Chiapetta's negligence and the issue of the employer's obligation to pay disability benefits under a pension plan "[did] not rise to the level of 'commonality

---

[3]The specific claims in the Zarillo suit include: discrimination under federal and state law, constructive discharge, assault and battery, intentional infliction of emotional distress, breach of contract based on a handbook and policy, breach of implied covenants, and loss of consortium.

6

of facts' necessary to trigger the entire controversy doctrine." Id. (citing Joel, 688 A.2d 1036). Thus, we held that, "[t]he two claims are separate and distinct, and failure to join them does not require a 'rerun' of the preceding litigation nor does this allow Fornarotto to 'seek two bites at the apple.'" Id.

Similarly, the Zarillo plaintiffs' sexual harassment claims against TPC, Thompson and Fields, and Fields's contract claims against TPC and Thompson do not constitute one controversy under the doctrine. There is no "rerun" here, as the question of TPC's obligation to Fields under the Employment Contract is a matter of contract law and turns on contractual language and principles, while the Zarillo litigation involved claims of harassment and hostile work environment that implicated certain duties and potential liability on the part of the defendants. Because the two sets of claims involve vastly different legal issues, and the resolution of those legal issues turns upon different sets of facts, the relationship between the two suits is "too attenuated to hold that both actions arise from a 'commonality of facts.'" Id.

Furthermore, even in the event that Fields's claims against TPC and Thompson could be said to be part of the same controversy giving rise to the Zarillo claims, basic notions of fairness would prevent us from applying the doctrine here. "Despite the doctrine's apparent rigidity, New Jersey courts have clearly stated that it is not to be applied in a rigid manner divorced from concepts of equity and

fairness." Fornarotto, 144 F.3d at 282; see also DiTrolio, 662 A.2d at 505 ("The polestar of the application of the rule is judicial fairness."); Cogdell, 560 A.2d at 1177 ("Party fairness is critical in the application of the doctrine.").

Specifically, in applying the entire controversy doctrine, "[f]airness is . . . a protective concept that focuses primarily on whether defendants would be in a better position to defend themselves if the claims had been raised and asserted in the first litigation." DiTrolio, 662 A.2d at 505. "A key determination is whether 'the defendants are now disadvantaged because they were not parties to the first litigation.'" Fornarotto, 144 F.3d at 282 (quoting DiTrolio, 662 A.2d at 505). Here, TPC was a party to the first litigation, and is not disadvantaged now on that basis. Furthermore, nothing occurred during the Zarillo lawsuit or since its settlement that would affect TPC's or Thompson's ability to defend themselves in the instant case. The main elements upon which the instant controversy turns - the contractual language and TPC's actions - remain constant and unexplored. As a result, we can fathom no reason why TPC and Thompson would have been better able to defend themselves from Fields's ERISA and breach of contract claims had he raised them in the earlier action.

In addition to examining the effect upon the defendants, "[f]airness to the plaintiff must also be considered." Joel, 688 A.2d at 1038. The New Jersey courts have stated that "[c]hief among the

equitable considerations determining the doctrine's applicability 'is the full and fair opportunity of the party sought to be precluded in the second action to have raised the claim there asserted in the original action.'" Illiano v. Seaview Orthopedics, 690 A.2d 662, 666 (N.J. Super. Ct. App. Div. 1997) (citation omitted). The issue is whether, considering what was at stake in the Zarillo action, it is "reasonable as a matter of practical jurisprudence" to require Fields to have sued his co-defendants in the same case. Id. We do not think such a requirement would be reasonable here. Forcing Fields to bring his claim as a cross-claim against TPC in the Zarillo action would not have aided the Zarillo plaintiffs' case in any way. In fact, it would have complicated the matter, and perhaps even jeopardized settlement. This not a situation where Fields withheld his claims relevant to the Zarillo action "for strategic reasons," seeking "two bites at the apple." Id. at 1041. Thus, the entire controversy doctrine does not apply, and Fields's claims are not precluded by his failure to bring them in the earlier action.[4]

## B. TPC's Obligation to Fields

Second, we examine defendants'

---

[4]This might be a closer question if TPC intended to offer proof of the alleged incidents of sexual harassment. However, it has maintained that its right to terminate Fields is clear based on the allegations made against him.

contention that the District Court erred in determining that TPC violated its obligations under ERISA[5] and the terms of the Employment Contract when it refused to pay Fields compensation or benefits after August 13, 1997. They argue that, in light of Fields's alleged acts of sexual harassment, it would violate public policy to enforce the agreement. In the alternative, they argue that Fields's alleged acts breached the agreement, terminating

---

[5]Fields's retirement benefits, as specified in the Employment Contract, constitute a so-called "Top Hat" plan. "Top Hat plans are clearly subject to ERISA." Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 286 (3d Cir. 1995). A participant in a "Top Hat" plan may bring a civil action "to recover benefits due to him under the terms if his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In such situations, "breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents." Kemmerer, 70 F.3d at 287. Thus, we apply federal common law to determine TPC's obligation to Fields with respect to his retirement benefits. However, we apply New Jersey law to determine TPC's obligation to Fields with respect to his pre-retirement compensation and benefits. As both bodies of law compel the same result (and since the parties did not distinguish between the two sets of benefits), we combine the discussion of the two claims.

TPC's obligation to continue to pay him.[6] Both of these arguments essentially urge us to look past the plain language of a relatively straightforward contract. Given the fact pattern before us, we will decline to do so.

It is axiomatic that a court may refuse to enforce a contract that violates public policy. See W.R. Grace & Co. v. Local 759, 461 U.S. 757, 766 (1983) (citing Hurd v. Hodge, 334 U.S. 24, 34-35 (1948)). "A promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." Town of Newton v. Rumery, 480 U.S. 386, 392 (1987). "Such a public policy, however, must be well-defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general

_____

[6]Fields has requested that the sections of defendants' brief arguing these points be stricken because they misrepresent facts contained in the record. Specifically, Fields argues that in these sections defendants, rather than acknowledging that Fields faced allegations of sexual harassment, instead use language that assumes Fields did, in fact, commit acts of sexual harassment. He contends that this is a deliberate attempt to mislead the court. However, defendants' statement of facts clearly states that acts of sexual harassment were merely alleged. Anyone reading the brief as a whole would understand that the acts were alleged and not proven. We see no reason to strike.

considerations of supposed public interests.'" Grace, 461 U.S. at 766. In New Jersey, for example, courts have declined to enforce contracts that violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality or restrain trade. Saxon Constr. & Mgmt. Corp v. Masterclean of North Carolina, Inc., 641 A.2d 1056, 1058 (N.J. Super. Ct. App. Div. 1994).

Here, the defendants argue that enforcement of the Employment Contract and compensation of Fields notwithstanding his alleged behavior violates the clear public policy against sexual harassment of both the United States, as embodied in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the state of New Jersey, as embodied in the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12. The defendants cite Stroehmann Bakeries, Inc. v. Local 776, 969 F.2d 1436 (3d Cir. 1992), in which this Court held that an arbitrator's order to reinstate an employee accused of sexual harassment, without a determination that the harassment did not occur, violated public policy. "There is a well-defined and dominant public policy concerning sexual harassment in the workplace which can be ascertained by reference to law and legal precedent." Id. at 1441.

However, Stroehmann is clearly distinguishable from the case at hand. Unlike the arbitrator's order there, the Employment Contract does not "undermine[] the employer's ability to

fulfill its obligation to prevent and sanction sexual harassment in the workplace." Id. at 1442. Enforcement of the Contract does not require TPC to hire or reinstate someone who may have engaged in acts of sexual harassment, which may violate the policy against "perpetuating a hostile and offensive work environment." Id. at 1443. Nor does the Contract impinge on TPC's ability to police the work environment and to prevent sexual discrimination. Rather, it requires TPC to pay certain sums if they terminated Fields, ostensibly for any reason, including improper and offensive conduct. Had TPC intended to avoid this result, they could have bargained for a limiting provision in the contract. But the absence of such a provision, owing to TPC's failure, does not "perpetuate a hostile and offensive work environment." Id. The principles of public policy simply do not reach that far.[7]

---

[7]Our decision in Stroehmann is distinguishable for two additional reasons. First, Stroehmann involved the review of an arbitrator's exercise of discretion, rather than the application of a straightforward contract clause. Second, the Stroehmann court, while holding that reinstatement was violative of public policy, specifically noted that the arbitrator could have concluded that a lesser punishment than termination was appropriate. Similarly, here, TPC could have retained the benefits it was due under the Employment Contract by continuing Fields's employment and taking less drastic steps to remedy

Fields relies on Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140 (3d Cir. 1999), and we find it to be more persuasive considering the fact pattern before us. United Way terminated Aramony, its CEO, after discovering that he had engaged in fraud. Id. at 143. After his conviction, United Way chose to deny him the pension benefits he was due under the organization's retirement plan. Id. Aramony filed suit to regain them. Id. On appeal, we affirmed the trial court's ruling that Aramony was entitled to the benefits because the retirement benefit plan contained no felony forfeiture provision. Id. at 149-150. "The signed plan simply does not include a felony forfeiture exception to its otherwise sweeping non-forfeiture clause. There is no basis upon which to read one into the contract." Id.

Here, Fields's Employment Contract, like the documentation in Aramony, does not include any conduct-related exception to its non-forfeiture clause. TPC asks us to save it from its own failure to include such a forfeiture clause. Doing so would essentially force us to read clauses thought desirable from a policy standpoint into every employment contract. This we cannot do. Employers may legitimately offer compensation and benefits that can be taken away only for specific reasons, or that cannot be taken away at all, in order to lure or reward employees. The absence of a forfeiture clause here suggests that this may well have been what was intended. As long as

---

whatever problem was found to exist.

10

the enforcement of the promise itself is not violative of public policy, we will not deny the parties the bargained-for relief. The fact that it could be said to have public policy implications is not enough. We find the payment of the bargained-for compensation does not violate public policy.

It should also be noted at this juncture that even were we inclined to look with disfavor on the rights of a harassing executive to continue to receive compensation in this situation, there has been no finding that Fields was in fact guilty of harassment. Clearly, any consideration of TPC's claim that it was entitled not to compensate Fields because of his conduct would have to be based on a finding that his behavior did rise to a level that had policy and contract implications. And, defendants have made no claim that they need an opportunity to prove that Fields did behave in such a manner, apparently resting on the principle that the allegations to that effect supported a denial of compensation.

Defendants' other argument is that, based on the allegations, Fields breached the Employment Contract, giving TPC the right to discontinue payment of the contractual benefits. The District Court dismissed this line of reasoning out of hand, concluding that TPC "was not deprived of the fruits of the Employment Agreement," and that "the implied duty defendants posit is trumped by the language of the parties' agreement." However, while we agree with the District Court's ultimate conclusion, a more careful look at defendants' argument is necessary.

Every contract in New Jersey does contain an implied covenant of good faith and fair dealing. See R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 773 A.2d 1132, 1145 (N.J. 2001); Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001); Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997); Pickett v. Lloyd's, 621 A.2d 445, 450 (N.J. 1993); Onderdonk v. Presbyterian Homes, 425 A.2d 1057, 1063 (N.J. 1981); Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc., 351 A.2d 349, 352 (N.J. 1976); Association Group Life, Inc. v. Catholic War Veterans, 293 A.2d 382, 384 (N.J. 1972); Palisades Properties, Inc. v. Brunetti, 207 A.2d 522 (N.J. 1965). We have previously noted the New Jersey courts' adherence to this view. See Emerson Radio Corp. v. Orion Sales Inc, 253 F.3d 159, 170 (3d Cir. 2001) (stating that New Jersey courts recognize an implied covenant of good faith and fair dealing). Under the implied covenant of good faith and fair dealing, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. R.J. Gaydos Ins. Agency, 773 A.2d at 1146; 13 Williston on Contracts § 38:15 (4th ed. 2000).

In addition, every employee owes a duty of loyalty to their employer. Cameco, Inc. v. Gedicke, 724 A.2d 783, 789 (N.J. 1999). The duty of loyalty "consists of certain very basic and common sense obligations." Lamorte Burns & Co. v.

11

Walters, 770 A.2d 1158, 1168 (N.J. 2001). This duty usually arises in situations where an employee has assisted a competitor of the employer or engaged in self-dealing. See Cameco, 724 A.2d at 789. However, it is also phrased more generally. "An employee must not while employed act contrary to the employer's interest." Lamorte Burns & Co., 770 A.2d at 1168.

Defendants argue that Fields breached the implied covenant of good faith and fair dealing inherent in the Employment Contract and the duty of loyalty inherent in his relationship with TPC, based on the employees' allegations of sexual harassment. These allegations, they contend, destroyed TPC's ability to reap to the benefits to which it was entitled under the Employment Contract - namely, Fields's services for ten years - by making it impossible for them to continue to employ him. In light of his breach and failure of performance, they maintain that they have the right to not perform their part.[8]

Fields argues that the only affirmative obligation that he had under the agreement was to perform the duties of the Vice President of TPC, and that he did so until the day that he was terminated, by which time he had been named President of the company. He cites authority for the proposition that courts are obligated to enforce contracts as they are made by the parties and not to create additional terms out of thin air. See, e.g., Marchak v. Claridge Commons, Inc., 633 A.2d 531 (N.J. 1993). However, "[i]mplied covenants are as effective components of an agreement as those covenants that are express," and "a party's performance under a contract may breach [an] implied covenant even though that performance does not violate a pertinent express term." Wilson, 773 A.2d at 1126. See also Emerson, 253 F.3d at 170 (stating that New Jersey law holds that a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract); Sons of Thunder, 690 A.2d at 588 (noting favorably that other courts have stated that a party can violate the implied covenant of good faith and fair dealing without violating an express term of the contract).

Further, an employee may violate the implied covenant of good faith and fair dealing even while performing his or her listed job duties to perfection. And we can imagine circumstances in which an employee who has committed acts of sexual harassment could be deemed to have breached this implied covenant. However, while the "principle of fair dealing pervades all of [New Jersey] contract law . . . [t]hat principle will not

---

[8] TPC has also framed this argument as Fields having, by his conduct, "voluntarily terminated" his position, relieving TPC of the responsibility to compensate him under the specific term of the Contract that so provides. However, the pleadings did not rely on this theory and we find it unnecessary to engage in this analysis.

alter the terms of a written agreement." Rudbart v. North Jersey District Water Supply Comm'n, 605 A.2d 681, 692 (N.J. 1992). "The implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc., 913 F. Supp. 837, 846 (D.N.J. 1995) (citing Glenfed Fin. Corp. v. Penick Corp., 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)). So, where the terms of a contract are not specific, the implied covenant of good faith and fair dealing may fill in the gaps where necessary to give efficacy to the contract as written. But where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language.

Here, the Employment Contract specifically provides:

This Contract shall be non-terminable by Thompson [Printing Company]. In the event Thompson [Printing Company] shall terminate the employment of Jerry [Fields], all of the benefits as contained herein shall continue in accordance with the terms and provisions of this Agreement.

This provision not only prohibits TPC from terminating the Contract but it provides further that if it should "terminate" Fields's "employment," Fields's benefits will continue. In other words, if TPC should fire him, it must still pay him. There is no differentiation between termination with cause and termination without cause; Fields's benefits are to continue in any event. Thus, under the express terms of the agreement, Fields has a right to benefits even in the event that he is terminated for cause.

Defendants' argument urges us to treat Fields's alleged behavior - behavior that could give rise to termination for cause - as a breach of the implied covenant of good faith and fair dealing. However, whether he breached this covenant, giving rise to a clear right to terminate him, is not the issue. The fact remains that even if he committed the alleged acts and the termination was justified, the express terms state that if he is terminated, benefits will continue. We cannot read the implied covenant of good faith and fair dealing to essentially alter the terms of the Contract, enabling TPC to discontinue Fields's benefits in the event that he was terminated for cause. Because TPC did not include a proviso that it would not have to continue Fields's benefits in the event he was terminated even for cause, we will not read that language into the Contract.

Defendants argue that the New Jersey courts have relieved an employer of the duty of strict performance of an employment contract when the employee has engaged in misconduct, relying on McGarry v. St. Anthony of Padua Roman Catholic Church, 704 A.2d 1353 (N.J. Super. Ct. App. Div. 1997). There,

13

McGarry had entered into an employment contract with St. Anthony's. Id. at 1354. The contract required the church to give McGarry notice of termination at least 30 days in advance of termination and to continue to pay him during the 30-day period if it did not wish him to work during that period. Id. at 1355. Three months after starting work, McGarry was arrested in the parking lot of the church for receiving shipments of illegal steroids and he admitted that he had been using the church property to receive other shipments. Id. Upon learning of the arrest, the church terminated McGarry, instructed him to stay off church grounds and refused to pay him, even under the 30-day notice requirement. Id. McGarry filed suit, contending that he had been wrongfully terminated and argued that he was entitled to 30 days' pay because the church had failed to follow the 30-day notice requirement. Id. at 1356.

The New Jersey Superior Court found that "even where . . . the employee performs the duties contracted for satisfactorily, criminal activity by the employee can justify his discharge for breach of an employment contract." Id. at 1357. As a result, St. Anthony's "had good cause to terminate the employment contract by virtue of [McGarry's] breach of the implied covenant of good faith and fair dealing." Id. Furthermore, McGarry was "not . . . allowed to recover termination pay under the termination clause of the breached contract." Id. at 1358. However, McGarry is distinguishable from the instant situation.

For one thing, the court clearly viewed the criminal nature of McGarry's acts to be critical to its analysis. Furthermore, the issue in McGarry was whether the termination was justified based on breach of an implied covenant. Id. The court held that is was. Id. Here, the issue is not whether termination was appropriate or called for, but rather, if termination occurs, what happens to Fields's benefits. Unlike McGarry, here the Contract speaks specifically to that issue. Thus, we will affirm the District Court's conclusion that TPC's failure to pay the required compensation constituted a breach of the employment agreement and its obligations under ERISA, and that Fields is entitled to all of the compensation and benefits that he was due under the plain meaning of the Contract.[9]

_____

[9]TPC argues that it has no obligation to pay Fields's "Top Hat" retirement benefits because it has no unencumbered assets, and that, in the event that Fields contests its claim that it has no unencumbered assets, the case must be remanded to make such a determination. We find this position to be meritless. "Top Hat" plans are treated like unilateral contracts. Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001). According to "unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain." Kemmerer, 70 F.3d at 287. Thus, TPC became obligated to pay Fields retirement benefits on his first

14

## C. Thompson's Personal Liability

Finally, we consider defendants' argument that the District Court erred when it imposed personal joint and several liability on Thompson. The Court's order stated:

Finally, because defendants have not argued what if any distinction should be drawn between defendant Thompson Printing and defendant Gilbert M. Thompson with respect to their liability to Fields, the Order shall not differentiate between them and they shall be jointly and severally liable for the relief granted by this Court's Order of Partial Summary Judgment.

As a preliminary matter, Fields contends that Thompson has waived this issue through his failure to raise it at the trial level. However, while Thompson clearly could have raised a genuine issue of material fact to avoid personal liability, the threshold burden was on Fields, who brought the claim against Thompson, to plead and prove undisputed facts that warranted an imposition of liability against Thompson personally as a matter of law. "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for

day of work under the Contract. Only Fields's voluntary termination could end that obligation. Whether or not TPC has unencumbered assets has no bearing on the question of its duty to pay.

its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. In order to be entitled to judgment against Thompson, Fields had to aver, and demonstrate he could prove, sufficient facts to support liability against Thompson under ERISA and under state law.

So, while the District Court placed the onus on the defendants to distinguish the liability of TPC from Thompson, it was really Fields's burden to not only plead, but also to prove, that he was entitled to judgment as a matter of law against Thompson. Thompson was the CEO of TPC, and the corporate officer responsible for terminating Fields and discontinuing his benefits. The pleadings allege generally that he violated fiduciary duties owed to Fields under ERISA, and that he and TPC breached the Contract by refusing to pay Fields salary and benefits after Fields's termination. But, these pleadings fall short of alleging, let alone establishing, a basis for personal liability against a corporate officer, on any of the claims at issue.

With regards to the ERISA claim, the parties have stipulated that Fields's post-employment benefits plan is a "Top Hat" plan. "Top Hat" plans are "unique animal[s] under ERISA's provisions." Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001). Because "these plans are intended to compensate only

15

highly-paid executives, and . . . such employees are in a strong bargaining position relative to their employers," they are free from some of the requirements that are imposed upon most ERISA plans in order to protect those employees covered by such plans. Id. Specifically, "Top Hat" plans are not subject to ERISA's requirements for vesting and funding, see 29 U.S.C. §§ 1051(2); 1081(a), and the administrators of these plans are not subject to ERISA's fiduciary requirements. See 29 U.S.C. §§ 1051(2), 1081(a), 1101(a). Thus, Thompson did not have a fiduciary duty with respect to Fields's "Top Hat" plan, and may not be held personally liable for any violations of ERISA with respect to that plan.

With respect to the breach of contract claim, New Jersey law provides that "an officer who causes his corporation to breach a contract for what he conceives to be in the best interest of the corporation does not thereby incur personal liability." Zeiger v. Wilf, 755 A.2d 608, 622 (N.J. Super. Ct. App. Div. 2000). In Zeiger, the New Jersey Superior Court cited with approval Oregon's test for determining whether an officer has acted in the best interest of the corporation. Id. at 623. The test asks

whether the agent acts within the scope of his authority, and with the intent to benefit the principal. When this test is met an agent is not liable to a third party for intentional interference with contract even if the agent acts with 'mixed motives' to benefit himself or another principal as well.

Id. (citing Welch v. Bancorp Mgmt. Advisor, Inc., 675 P.2d 172, 178 (Or. 1983)).

Thus, Thompson can be held personally liable only if Fields alleges and proves that Thompson was not acting with the intent to benefit TPC when he refused to pay Fields the benefits and compensation that were due under the employment agreement. See also Law of Corp. Officers and Dir., § 3:30 (2004) ("[A] corporate officer or director is not personally liable for . . . inducing the breach of a corporate contract, provided the officer or director acts in good faith and for the benefit of the corporation."); 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1158.10 (2002). Fields has failed to make such an allegation, let alone present proof of facts necessary to impose officer liability. Fields's motion for summary judgment is not accompanied by any evidence that could provide a basis for a finding that Thompson acted in bad faith. The Statement of Facts that Fields filed in support of his motion for summary judgment contains facts about Fields's employment history with TPC, the company's termination of Fields, and its failure to pay him salary and benefits after that termination. However, nowhere does it state any facts that would support Thompson's being held personally liable. In fact, the only specific allegations relating to Thompson were in connection with the ERISA claim, dealt with above, and the minority oppression claim, which was withdrawn before this appeal. As a

result, the imposition of personal liability and judgment against Thompson was improper, and that portion of the District Court's opinion will be reversed.

## D. Cross-Appeal of Attorneys' Fees

On cross-appeal, Fields challenges the District Court's decision not to grant him attorneys' fees. ERISA provides that "the court in its discretion may allow reasonable attorney's fees and costs of action to either party." 29 U.S.C. § 1132(g)(1). We have set forth five policy factors for a district court to consider in determining whether to award fees: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorney' fees; (3) the deterrent effect of an award of attorneys' fees; (4) the benefit conferred upon members of the pension plan as a whole; and (5) the relative merits of the parties' positions. Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir. 1983). In Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1011 (3d Cir. 1992), we reiterated that "we regard our requirement that district courts consider and analyze these factors as a mandatory requirement." See also McPherson v. Employees' Pension Plan of Am. Re-Insurance Co., 33 F.3d 253, 254 (3d Cir. 1994). We require such an analysis "in order that we may intelligently review the judgments reached by those courts." Anthuis, 971 F.2d at 1011.

In Anthuis, the district court had denied a party's request for attorney's fees

with the following statement:

Plaintiff has requested attorney's fees which are available pursuant to our discretion under 29 U.S.C. § 1132(g)(1). We will deny that request. Colt has neither acted in bad faith, nor pressed a clearly meritless position.

Id. We noted there that "the district court considered factors one and five of the Ursic catechism, but did so without analysis or articulation of its reasons. Moreover, the district court's opinion [was] silent with respect to the other Ursic factors." Id. at 1012. Thus, we were

hampered in our review function because the district court failed to enunciate the reasons for the conclusions it reached in denying . . . attorneys' fees, and additionally [had] utterly failed to recognize, analyze, explain or enunciate conclusions concerning the other Ursic factors which it was required to consider.

Id. As a result, we remanded the issue to the district court for further consideration.

Here, the District Court denied Fields's request for attorneys' fees by stating:

The statute provides that fees may be awarded to a prevailing litigant upon a showing, inter alia, of culpability or bad faith of the party in violation of the statute. 29 U.S.C. § 1132(g)(1). Plaintiff's showing on this motion falls well short of establishing this peculiarly fact-sensitive

element beyond any reasonable dispute.

Fields contends that this statement provides insufficient reasoning for the court to have ruled on the issue of fees. Inasmuch as it is nearly identical to the statement deemed insufficient in Anthuis, we agree. The District Court did not mention four of the Ursic factors, much less analyze them in a rigorous fashion. A conclusory statement that one of the factors has not been fulfilled is not enough to discharge the District Court's responsibility to explain its reasoning. In addition, the Ursic factors are not requirements in the sense that a party must demonstrate all of them in order to warrant an award of attorney's fees, but rather they are elements a court must consider in exercising its discretion. Even if the District Court's analysis of the first factor was sufficient - which it was not - it was obliged to examine the remaining factors as well.

Although we find the District Court's explanation wanting, we cannot, as Fields asks, conclude that the court abused its discretion in denying the fees. While he urges that we should examine the record ourselves and draw our own conclusions regarding the propriety of awarding attorneys' fees, "the function of analyzing and balancing [the Ursic] considerations is not ours to undertake." Anthuis, 971 F.3d at 1012. We may review a district court's decision regarding fees and costs "only when we know the reasons for, and the basis of, those factors on which the district court relied when it exercised its discretion." Id. Here, the District Court did err in not providing an adequate basis for its reasoning under Ursic. Accordingly, we will vacate its ruling in this regard and remand this issue for further consideration.

III.

For all of the reasons above, we will affirm the order of the District Court insofar as it authorizes judgment against TPC, reverse the order of the District Court insofar as it authorizes judgment against Thompson, and vacate and remand to District Court for further proceedings with respect to the issue of the award of attorneys' fees.